Michael F. Perlis (SBN: 095992)
mperlis@lockelord.com
Richard Johnson (SBN: 198117)
rrjohnson@lockelord.com
LOCKE LORD LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone: 213-485-1500
Fax: 213-485-1200

Attorneys for Defendant
MARKEL AMERICAN INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEYERS FINANCIAL SERVICES, INC., a California corporation, and LILLIAN MEYERS, <br><br> Plaintiffs, <br><br> vs. <br><br> MARKEL AMERICAN INSURANCE CO., and DOES 1 through 20, <br><br> Defendants. | CASE NO.  3:19-cv-3531 <br><br> **NOTICE OF REMOVAL AND REMOVAL TO FEDERAL COURT BY DEFENDANT MARKEL AMERICAN INSURANCE COMPANY** |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT, AND INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendant Markel American Insurance Company hereby removes this action from the Superior Court of California, County of Sonoma, to the United States District Court for the Northern District of California under 28 U.S.C. Sections 1332,1441 and 1446.

///

///

///

Locke Lord LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, CA 90071

1

Dated:  June 19, 2019                                 Respectfully submitted,

2

LOCKE LORD LLP

3

4

By:_____

5

Michael F. Perlis
Richard R. Johnson

6

*Attorneys for Plaintiff MARKEL AMERICAN*
*INSURANCE COMPANY*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Locke Lord LLP**
300 S. Grand Avenue, Suite 2600
Los Angeles, CA 90071

71651811v.2

NOTICE OF REMOVAL AND REMOVAL TO FEDERAL COURT
BY DEFENDANT MARKEL AMERICAN INSURANCE COMPANY

Defendant Markel American Insurance Company ("MAIC"), the removing Defendant, makes the following allegations in support of its Notice of Removal:

## I.   STATEMENT OF THE CASE

1.   On June 5, 2019, Plaintiffs Meyers Financial Services, Inc. and Lillian Meyers ("Plaintiffs") filed a Complaint against MAIC in the Superior Court of California, County of Sonoma, entitled *Meyers Financial Services, Inc., et al. v. Markel American Insurance Company and Does 1-10.*, Sonoma County Superior Court Case No. SCV 264560 (the State Court Action).

2.   Plaintiffs assert the following causes of action in the State Court Action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) declaratory relief. A true and complete copy of the Complaint and all other documents provided to MAIC are attached hereto as Exhibit A.

## II.   DIVERSITY JURISDICTION

3.   The federal Court has original jurisdiction over this action under 28 U.S.C. Section 1332 because there is a preponderance of evidence that there is complete diversity of citizenship between Plaintiffs and MAIC (which is the only named defendant) and that the amount in controversy is more than $75,000, exclusive of interest and costs. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).

4.   Plaintiff Meyers Financial Services, Inc. is a California corporation with its principal place of business and apparent center of operations in Sonoma County, California. (Complaint ¶ 2.) Plaintiff Lillian Meyers, an individual, is a resident of California. (Complaint ¶ 3.) Defendant MAIC, the only named Defendant, is a Virginia corporation with its principal place of business and center of operations in Glen Allen, Virginia. (Declaration of Richard Johnson, ¶ 2.) Therefore, there is complete diversity between Plaintiff and all Defendants.

5.   The amount in controversy in this case exceeds $75,000. Specifically, while Plaintiffs allege that the amount of damages "cannot be determined with certainty at this time, but is believed to be not less than $50,000[,]" this Court can take judicial notice that the amount in controversy is actually far in excess of $75,000 because Plaintiffs attach to their Complaint: (1) a copy of the

Locke Lord LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, CA 90071

1    underlying *Wrobel* complaint as to which the Plaintiffs in this action sought defense and indemnity

2    from MAIC, in which the underlying plaintiffs seek relief totaling over $510,000.00 from Plaintiffs

3    and related persons for whom Plaintiffs herein have claimed coverage and MAIC has denied coverage

4    (Exhibit B); and (2) a copy of the Policy MAIC issued to Plaintiff Meyers Financial Services, Inc.,

5    with limits of liability of $1,000,000.00 (Exhibit A).

6        6.    Accordingly, MAIC has shown by a preponderance of the evidence that this Court has

7    subject matter jurisdiction over this action because all of the requirements of 28 U.S.C. Section

8    1332(a)(2) are satisfied.  28 USC § 1446(c)(2)(B); *Sanchez v. Monumental Life Ins. Co.*, 102 F. 3d

9    398, 403-404 (9th Cir. 1996) (case removable if Court finds by a preponderance of the evidence that

10    the amount in controversy exceeds $75,000); *McPhail v. Deere & Co.*, 529 F. 3d 947, 954-955 (10th

11    Cir. 2008) (removing defendant, which bears the burden of proving by a preponderance of the evidence

12    that the amount in controversy is satisfied, need not prove to a legal certainty that the amount in

13    controversy requirement has been met; rather, defendant may simply allege in its notice of removal

14    that the jurisdictional threshold has been met and discovery may be taken with regard to that question).

15    **III.**    **REMOVAL REQUIREMENTS**

16        7.    This notice of removal is filed by MAIC.  There are no other named Defendants in the

17    State Court Action and there is no indication that service has been completed on any "DOE"

18    Defendants in this matter.  Absent service, their consent to this removal is not required. *See Emrich v.*

19    *Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1 (9th Cir. 1988) (requirement for consent applies "only

20    to defendants properly joined and served in the action").

21        8.    Venue is equally proper in this district pursuant to 28 U.S.C. Section 1441(a) because

22    this district embraces the county in which the State Court Action is pending. 28 U.S.C. § 1141(a).

23        9.    A copy of this Notice of Removal will be served upon Plaintiff and filed with the

24    Superior Court of the County of Sonoma. 28 U.S.C. §§ 1446(a), (d).

25        10.    This Notice of Removal is signed by MAIC's counsel pursuant to Federal Rule of Civil

26    Procedure 11. 28 U.S.C. § 1446(a).

*Left margin:* **Locke Lord LLP** 300 S. Grand Avenue, Suite 2600 Los Angeles, CA 90071

1    11.    "[E]ach defendant has thirty days to remove after being brought into the case." *Destfino*

2  *v. Reiswig*, 630 F.3d 952, 956 (9th Cir. 2011). Formal service is required to trigger the 30-day period.

3  *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999). Only 14 days have

4  elapsed since Plaintiffs filed the Complaint; accordingly, far fewer than thirty days have elapsed since

5  MAIC received a copy of the pleadings. Because MAIC is removing this matter within the 30-day

6  period following receipt of the Complaint, this Notice of Removal is timely under 28 U.S.C. Section

7  1446(b).

8  **IV.   CONCLUSION**

9    12.    By this Notice of Removal and the associated attachments, MAIC does not waive any

10  objections it may have as to service, jurisdiction, venue, or any other defenses or objections it may

11  have to this action.  MAIC intends no admission of fact, law, or liability by this Notice, and expressly

12  reserves all defenses, motions, or pleas.

13    14.    MAIC prays that the State Court Action be removed to this Court, that all further

14  proceedings in the State Court Action be stayed, and that MAIC receive all additional relief to which

15  it is entitled.

16

17  Dated:  June 19, 2019                    Respectfully submitted,

18                                           LOCKE LORD LLP

19

20                                           By: _/s/ Michael F. Perlis_____

21                                                Michael F. Perlis

22                                                Richard R. Johnson

23                                           *Attorneys for Defendant*

24                                           *MARKEL AMERICAN INSURANCE*
                                             *COMPANY*

25

26

27

28

Locke Lord LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, CA  90071

71651811v.2

NOTICE OF REMOVAL AND REMOVAL TO FEDERAL COURT
BY DEFENDANT MARKEL AMERICAN INSURANCE COMPANY

# EXHIBIT "A"

1   LEWIS R. WARREN, ESQ. (SBN 115411)
    lwarren@abbeylaw.com
2   MICHAEL R. WANSER, ESQ. (SBN 283822)
    mwanser@abbeylaw.com
3   ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
    100 Stony Point Road, Suite 200
4   Santa Rosa, CA  95401
    Telephone:    (707) 542-5050
5   Facsimile:    (707) 542-2589

**FILED**

JUN - 5 2019

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA
By _____
            Deputy Clerk

6   Attorneys for MEYERS FINANCIAL SERVICES,
    INC. and LILLIAN MEYERS

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                               COUNTY OF SONOMA

10  MEYERS FINANCIAL SERVICES,          )   Case No. SCV  264500
    INC., a California corporation, and LILLIAN )
11  MEYERS,                             )   **COMPLAINT FOR INSURANCE BAD**
                                        )   **FAITH, BREACH OF CONTRACT,**
12                  Plaintiffs,         )   **AND DECLARATORY RELIEF**
                                        )
13        v.                            )
                                        )
14  MARKEL AMERICAN INSURANCE CO.,      )
    and DOES 1 through 20,              )
15                                      )
                    Defendants.         )
16

17                               **INTRODUCTION**

18        1.      Plaintiffs Lillian Meyers and Meyers Financial Services, Inc., bring this insurance

19  bad-faith action to obtain the benefits to which they are owed under a policy of insurance which

20  they purchased from Defendant Markel American Insurance Co. Plaintiffs dutifully paid all

21  necessary premiums to Markel over the years, which premiums Markel readily accepted. But, in

22  Plaintiffs' first moment of need, as described more fully below, Markel has refused to provide

23  benefits owed to Plaintiffs by refusing to defend and indemnify Plaintiffs for claims which fall

24  squarely within the policy's coverage provisions. To make matters worse, Markel has threatened

25  to sue Plaintiffs or their counsel for having the temerity to insist upon obtaining the contractual

26  benefits Plaintiffs are owed. By denying coverage clearly called for under the policy, and

27  threatening litigation when Plaintiffs pushed back against that wrongful denial, Markel is putting

28  its own financial interests ahead of those of its insureds and using intimidation to avoid paying

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050 Facsimile (707) 542-2589

                                      -1-
                                 **COMPLAINT**

1   what it is obligated to pay. Such actions are breaches of Markel's contractual obligations and the

2   implied covenant of good faith and fair dealing, as more fully described below.

3   <div align="center">**THE PARTIES**</div>

4       2.        Plaintiff Meyers Financial Services, Inc. ("MFS") is, and at all times relevant

5   hereto was, a California Corporation with its principal place of business in the County of Sonoma,

6   State of California.

7       3.        Plaintiff Lillian Meyers ("Meyers") is, and at all times relevant hereto was, an

8   individual residing in the County of Sonoma, State of California. Meyers is the principal of MFS.

9       4.        Plaintiffs are informed and believe, and thereupon allege, that Defendant Markel

10   American Insurance Company ("Markel") is a Virginia Corporation with its principal place of

11   business in the County of Henrico, State of Virginia.

12       5.        Plaintiffs are unaware of the true identity, nature, and capacity of each of the

13   Defendants designated herein as a DOE. Plaintiffs are informed and believe, and thereupon

14   allege, that each of the Defendants designated herein as a DOE is in some manner responsible for

15   the damages and injuries as are alleged in this Complaint. Upon learning the true identity, nature,

16   and capacity of the DOE Defendants, Plaintiff will amend this Complaint to allege their true

17   names and capacities.

18       6.        Plaintiffs are informed and believe, and thereupon allege, that at all times relevant

19   hereto, the Defendants, and each of them, were the agents, servants, and employees of the other

20   Defendants, and each of them.

21   <div align="center">**FACTS COMMON TO ALL CAUSES OF ACTION**</div>

22       7.        At all times relevant to this Complaint, Plaintiff MFS has operated as a financial

23   services business located at 670 West Napa Street, Suite C, Sonoma, California. MFS provides

24   sophisticated wealth management, investment, and tax planning services. Plaintiff Lillian Meyers

25   is the founder and president of MFS.

26       8.        MFS purchased a policy of Investment Advisor, Professional Services, and

27   Directors and Officers liability insurance from Markel, Policy No. FP83837C (the "Policy")

28   pursuant to which MFS and Meyers are each a named insured. The Policy was effective during all

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050   Facsimile (707) 542-2589

<div align="center">-2-

**COMPLAINT**</div>

1  material times alleged herein. The Policy obligates Markel to pay up to $1,000,000 for losses

2  covered under the Policy, which include, among many other things, "any actual or alleged error,

3  misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by

4  any insured advisor or its insured persons…in rendering or failing to render investment advisory

5  services." A true and correct copy of the Policy is attached hereto as **Exhibit A** and incorporated

6  herein by this reference.

7         9.  On or about March 14, 2019, William Wrobel, a former client of MFS, filed a

8  lawsuit in the Sonoma County Superior Court, entitled *Wrobel v. Meyers Financial Services, Inc.*,

9  Sonoma County Case No. SCV-264114 (the "*Wrobel* Action"). The complaint in the *Wrobel*

10  Action alleges, among other things, that the Plaintiffs herein, MFS and Meyers, made

11  misstatements, omitted material information, and otherwise breached their duties to Mr. Wrobel

12  in providing investment advisory services—allegations which trigger Markel's duty to defend and

13  indemnify its insureds. A true and correct copy of the complaint in the *Wrobel* Action is attached

14  hereto as **Exhibit B** and incorporated herein by this reference.

15        10.  Plaintiffs duly and timely tendered the *Wrobel* Action to Markel and requested that

16  Markel agree to defend and indemnify them in accordance with Markel's obligations under the

17  Policy to ensure that Plaintiffs obtain the benefits due to them for the premiums they have been

18  paying to Markel for many years. Markel has refused, and continues to refuse, to provide

19  Plaintiffs with the defense and indemnity of the claims in the *Wrobel* Action.

20        11.  Plaintiffs are informed and believe, and thereupon allege, that Markel has failed to

21  conduct a prompt, full, and complete investigation of the facts and circumstances giving rise to

22  Plaintiffs' claims for defense and indemnity under the Policy, and has wrongfully denied

23  Plaintiffs the benefits of the coverage to which they are entitled under the Policy.

24        12.  To make matters worse, Markel threatened to sue Plaintiffs and/or their counsel for

25  when Plaintiffs insisted that Markel abide by its contractual obligations to defend and indemnify

26  them. Plaintiffs therefore bring this lawsuit to require Markel to provide the defense and

27  indemnity they are obligated to provide, and to hold Markel accountable for the damages its bad-

28  faith denial of coverage has caused to Plaintiffs.

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050  Facsimile (707) 542-2589

-3-
**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CAUSE OF ACTION**
**(Breach of Contract against Markel and Does 1-10)**

13.     Plaintiffs incorporate and reallege the allegations of paragraphs 1-12 as though fully set forth herein.

14.     The Policy is a valid, enforceable contract.

15.     Plaintiffs have performed all of their obligations under the Policy, except for those obligations which because of the breach of Markel and Does 1 through10, or any of them, of their obligations, Plaintiffs have been excused or prevented from performing.

16.     Plaintiffs are informed and believe, and thereupon allege, that Markel and Does 1 through 10, and each of them, breached their obligations under the Policy in, among others, the following respects:

a.     Failing and refusing to conduct a prompt, full, and good-faith investigation of the claims for defense and indemnity timely and duly tendered by Plaintiffs;

b.     Knowingly, wrongfully, and in bad faith denying Plaintiffs the benefits lawfully owed to them under the Policy by refusing to defend and indemnify Plaintiffs for claims alleged in the *Wrobel* Action which are based on "wrongful acts" as that term is defined in the Policy, thereby improperly limiting the benefits to which Plaintiffs are entitled under the Policy;

c.     Adopting a narrow, strained, deceptive, and unreasonable interpretation of the Policy inconsistent with the law and practice within the insurance industry in an effort to delay or deny the payment of benefits due under the Policy;

d.     Withholding benefits due to Plaintiffs under the Policy when Markel knew, or should have known, that Plaintiffs were entitled to those benefits;

e.     Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claims;

f.     Failing to adopt and implement fair business practices and reasonable standards for the investigation, handling, processing, and settlement of Plaintiffs' claims;

g.     Compelling Plaintiffs to initiate litigation to obtain the benefits due under the

-4-

**COMPLAINT**

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050 Facsimile (707) 542-2589

1        Policy and threatening to sue Plaintiffs and/or their counsel for bringing such a

2        lawsuit;

3    h.    Placing Markel's interests ahead of the interests of Plaintiffs;

4    i.    Misrepresenting and misconstruing Plaintiffs' rights under the Policy;

5    j.    Attempting to mislead Plaintiffs in order to prevent them from recovering benefits

6        due under the Policy; and

7    k.    Frustrating the reasonable expectations of Plaintiffs by providing illusory and

8        deceptive coverage.

9    17.   As a direct and proximate result of the conduct of Markel and Does 1-10, and each

10   of them, as herein alleged, Plaintiffs have been required to retain attorneys to obtain benefits due

11   to them under the Policy.

12   18.   As a further direct and proximate result of the breaches of the Policy by Markel

13   and Does 1-10, and each of them, as herein alleged, Plaintiffs are entitled to recover damages,

14   including, but not limited to, contract benefits to which they are entitled, interest on the amounts

15   due from the date those amounts became due, attorney's fees, general damages, special damages,

16   and other consequential damages according to proof. The sum of such damages cannot be

17   determined with certainty at this time, but is believed to be not less than $50,000 together with

18   interest as permitted by law. Plaintiffs pray leave to amend this Complaint in accordance with

19   proof when said amounts have been ascertained.

20                    **SECOND CAUSE OF ACTION**
                **(Breach of the Implied Covenant of Good Faith and Fair Dealing**
21                **Against Markel and Does 1 through 10)**

22   19.   Plaintiffs incorporate and reallege the allegations of paragraphs 1-12 and 14-16 as

23   though fully set forth herein.

24   20.   Plaintiffs are informed and believe, and thereupon allege, that Markel and Does 1

25   through 10, and each of them, breached the implied covenant of good faith and fair dealing

26   arising out of the Policy, have denied and continue to deny Plaintiffs' claims for defense and

27   indemnity, and have engaged and continue to engage in unlawful insurance practices designed to

28   further their own economic interests as opposed to the Plaintiffs' in violation of their legal

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050 Facsimile (707) 542-2589

-5-

obligations to the Plaintiffs, in among others, the following ways:

a.  Failing and refusing to conduct a prompt, full, and good-faith investigation of the claims for defense and indemnity timely and duly tendered by Plaintiffs;

b.  Knowingly, wrongfully, and in bad faith denying Plaintiffs the benefits lawfully owed to them under the Policy by refusing to defend and indemnify Plaintiffs for claims alleged in the *Wrobel* Action which are based on "wrongful acts" as that term is defined in the Policy, thereby improperly limiting the benefits to which Plaintiffs are entitled under the Policy;

c.  Adopting a narrow, strained, deceptive, and unreasonable interpretation of the Policy inconsistent with the law and practice within the insurance industry in an effort to delay or deny the payment of benefits due under the Policy;

d.  Withholding benefits due to Plaintiffs under the Policy when Markel knew, or should have known, that Plaintiffs were entitled to those benefits;

e.  Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claims;

f.  Failing to adopt and implement fair business practices and reasonable standards for the investigation, handling, processing, and settlement of Plaintiffs' claims;

g.  Compelling Plaintiffs to initiate litigation to obtain the benefits due under the Policy and threatening to sue Plaintiffs and/or their counsel for bringing such a lawsuit;

h.  Placing Markel's interests ahead of the interests of Plaintiffs;

i.  Misrepresenting and misconstruing Plaintiffs' rights under the Policy;

j.  Attempting to mislead Plaintiffs in order to prevent them from recovering benefits due under the Policy; and

k.  Frustrating the reasonable expectations of Plaintiffs by providing illusory and deceptive coverage.

21.   Plaintiffs are informed and believe, and thereupon allege, that Markel and Does 1 through 10, and each of them, have breached their duty of good faith and fair dealing owed to

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050 Facsimile (707) 542-2589

-6-

1    Plaintiffs by additional acts and omissions of which Plaintiffs are presently unaware, and

2    evidence of which will be presented at trial after it is learned through the process of discovery.

3        22.    As a direct and proximate result of the unreasonable conduct of Markel and Does 1

4    through 10, and each of them, as herein alleged, Plaintiffs have been required to retain attorneys

5    to obtain benefits due to them under the Policy.

6        23.    As a further direct and proximate result of the unreasonable conduct of Markel and

7    Does 1 through 10, and each of them, as herein alleged, Plaintiffs are entitled to recover damages,

8    including, but not limited to, contract benefits to which they are entitled, interest on the amounts

9    due from the date those amounts became due, attorney's fees, general damages, special damages,

10   and other consequential damages according to proof. The sum of such damages cannot be

11   determined with certainty at this time, but is believed to be not less than $50,000, together with

12   interest as permitted by law. Plaintiffs pray leave to amend this Complaint in accordance with

13   proof when said amounts have been ascertained.

14       24.    Markel has engaged, and is presently engaged, in the practices and conduct

15   described herein in an attempt to force Plaintiffs to settle their claims for less than what Plaintiffs

16   are due under the Policy or to take nothing. Markel has knowingly and consciously ignored, and

17   continues to ignore Plaintiffs' rights and has done so intentionally, maliciously, and as part of a

18   business practice designed to unfairly maximize Markel's profits to the severe detriment of

19   Plaintiffs. Such despicable conduct was done with the intent to vex, injure, or annoy Plaintiffs

20   such as to constitute oppression, fraud, or malice under California Civil Code section 3294,

21   entitling Plaintiffs to punitive damages in an amount appropriate to punish Markel within the

22   dictates of due process, or set an example of Markel to discourage similar conduct in the future.

23       25.    Markel's conduct described herein was undertaken by Markel's employees, agents,

24   officers or managing agents and/or representatives identified as DOES 1-5, who were responsible

25   for supervision and operation, reports, communications and/or decisions in the day-to-day and

26   overall operation of the company. The conduct of said parties was therefore undertaken on behalf

27   of Markel. Markel further had advance knowledge of the action and conduct of said individuals

28   whose actions and conduct were ratified, authorized, and approved by managing agents whose

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050  Facsimile (707) 542-2589

1    precise identities are unknown to Plaintiffs at this time.

2

3                              **THIRD CAUSE OF ACTION**
                                  **(Declaratory Relief)**

4        26.    Plaintiffs incorporate and reallege the allegations of paragraphs 1-12, 14-16, and

5    20-21, as though fully set forth herein.

6        27.    An actual controversy exists between Plaintiffs and Defendants in that Plaintiffs

7    contend and Defendants deny that Defendants, and each of them: (i) failed to conduct a prompt,

8    full, and complete investigation of the facts and circumstances giving rise to Plaintiffs' claims for

9    defense and indemnity pursuant to the Policy; and (ii) wrongfully refused to defend and

10   indemnify Plaintiffs in accordance with Defendants' obligations under the Policy and in so doing,

11   Defendants, and each of them, have deprived Plaintiffs of the full benefits of the coverage to

12   which they are entitled under the Policy.

13       28.    Plaintiffs desire a judicial declaration of the rights and duties of the parties with

14   respect to the matters herein alleged. Such a declaration is necessary and proper at this time to

15   conclusively determine the rights and obligations of the parties hereto under the Policy.

16                                **PRAYER FOR RELIEF**

17       WHEREFORE, Plaintiffs pray for judgment as follows:

18       1.     Damages in a sum of not less than $50,000 in accordance with proof at trial;

19       2.     For a judicial declaration in accordance with the Third Cause of Action;

20       3.     Interest as permitted by law;

21       4.     Attorney's fees as permitted by law or contract;

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050  Facsimile (707) 542-2589

-8-

1      5.      Punitive damages in accordance with the allegations of the Second Cause of

2  Action, as permitted by law; and

3      6.      Such other and further relief as the Court deems just and proper.

4  Dated:  June 4, 2019                           ABBEY, WEITZENBERG, WARREN &
                                                  EMERY
5

6

7                                                 Lewis Warren
                                                  Michael R. Wanser
8                                                 Attorney for MEYERS FINANCIAL SERVICES,
                                                  INC. and LILLIAN MEYERS
9

10

ABBEY, WEITZENBERG, WARREN & EMERY, P.C.
100 Stony Point Road, Suite 200, P.O. Box 1566, Santa Rosa, CA 95402-1566
Telephone: (707) 542-5050  Facsimile (707) 542-2589

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-9-
**COMPLAINT**

# EXHIBIT A

**PROFESSIONAL LIABILITY**
POLICY NUMBER: FP83837C


**MARKEL®**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

| POLICY NUMBER:<br>FP83837C | POLICY CHANGES<br>EFFECTIVE:<br>2/18/19 | POLICY CHANGE NUMBER: 1 |
|---|---|---|
| NAMED INSURED:<br>Meyers Financial Services, Inc. | | PRODUCER NAME AND ADDRESS:<br>KR Golsan Inc |

THIS ENDORSEMENT MODIFIES INSURANCE UNDER THE FOLLOWING:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

The following item(s):

| | | | | |
|---|---|---|---|---|
| ☐ | Named Insured | ☐ | Mailing Address |
| ☐ | Policy Period | ☐ | Insured Legal Status/Business Of Insured |
| ☐ | Retroactive Date | ☐ | Policy Premium |
| ☐ | Effective/Expiration Date | ☐ | Retention |
| ☐ | Payment Plan | ☐ | Endorsements |
| ☐ | Limit(s) Of Liability | ☐ | Rates/Scheduled Rating |
| ☐ | Other. Specify – | | |

is (are) changed to read as shown below:
In consideration of the additional premium shown below, MPL 1220 has been added.

All other terms and conditions remain unchanged.

| PREMIUM ADJUSTMENT | | |
|---|---|---|
| ☐ NO CHANGES | ADDITIONAL PREMIUM | RETURN PREMIUM |
| | $ 271.00 | $ |

*Authorized Representative Signature*

Authorized Representative Signature



Your E&O policy

Markel's Investment Advisor Professional Liability program has been providing Errors & Omissions insurance to investment advisors and divorce financial consultants for three decades. Our leadership has a wealth of knowledge and experience in advisory practice management, as well as in the claims process. Our team of underwriters can work with you to structure an insurance policy that fits your specific needs, while our seasoned claims professionals will help you to successfully navigate a loss or claim.

## Key reminders

### Strong defense provision

- "Right and duty" to defend policy – contractual obligation to defend against covered wrongful acts.
- Our policy is required to pay both defense costs and damages owed.

### Incident trigger

- You can contact us about a potential claim before you have an actual written claim. We can often navigate, mitigate, or eliminate the incident before it escalates.

### Submitting a formal claim

1. Please contact your insurance broker immediately. (for assistance please call us at 800-691-1515)
2. Send an email with all claim information to newclaims@markelcorp.com and investmentadvisors@markelcorp.com.
3. You can follow up on a claim by contacting Leonard Cooper at 212-551-2287 or lcooper@markelcorp.com.

**For more information about our program, risk management articles, and FAQs, please visit markelinvestmentadvisors.com.**

## Hotline

### Risk management and loss prevention

Policyholders have access to our risk management and loss prevention hotline. This hotline allows policyholders to discuss potential claim scenarios with an attorney. Markel will pay up to $10,000 (without triggering the deductible) in investigative costs if the policyholder calls us before a claim is filed.

In order to access the risk management and loss prevention hotline, please visit: markelinvestmentadvisors.com and select "Claim advice". The policyholder will be prompted to provide their policy number in order to receive access to the hotline.

P.O. Box 2009
Glen Allen, VA 23058-2009
Phone: 800-691-1515 Fax: 802-864-9369
Email: investmentadvisors@markelcorp.com



MARKEL®

8/6/18

**A STOCK COMPANY**



**MARKEL AMERICAN INSURANCE COMPANY**
**4521 Highwoods Parkway**
**Glen Allen, Virginia 23060**
**(800) 431-1270**

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                      **President**

MJIL 1000 06 10                                                        Page 1 of 1

**PROFESSIONAL LIABILITY**

**MARKEL®**

# MARKEL AMERICAN INSURANCE COMPANY

## POLICYHOLDER DISCLOSURE NOTICE OF CERTIFIED ACTS OF TERRORISM COVERAGE

**Disclosure** You are hereby notified that under the Terrorism Risk Insurance Act as amended in 2015 the definition of terrorism has changed *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under the Act, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. The Act requires the Insurer to also notify you that Terrorism Coverage required to be offered by the Act for losses caused by certified acts of terrorism is partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

### Disclosure Of Premium

Certified acts of terrorism coverage is provided for no additional premium.



**MARKEL®**

## PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described   We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you

We collect nonpublic personal information about you from the following sources.

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates, or others, and/or
- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or
- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law.  We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California.*

You may request to review and make corrections to recorded non-public personal information contained in our files.  A more detailed description of your rights and practices regarding such information is available upon request.  Please contact your agent/broker for instructions on how to submit a request to us.

**INTERLINE**

# MARKEL AMERICAN INSURANCE COMPANY

## CALIFORNIA PREMIUM REFUND DISCLOSURE NOTICE

In accordance with CAL. INS. CODE § 481.(c), we are notifying you that in the event that the first Named Insured cancels the insurance policy, we may retain 10% of the unearned premium. The premium refunded to you will therefore be calculated as 90% of the pro rata unearned premium. But if cancellation takes place during the first year of a multiyear prepaid policy, we will return 90% of the pro rata unearned premium for the first year and the full annual premium for the subsequent years.

However, the penalties set forth in the preceding paragraph will not apply under the following circumstances, even if the first Named Insured cancels the policy·

1.  The Insured(s) no longer has a financial or insurable interest in the property or business operation that is the subject of insurance,

2.  Cancellation takes place after the first year for a prepaid policy written for a term of more than one year; or

3.  The policy is rewritten in the same insuring company or company group.



# Markel American Insurance Company

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# MARKEL AMERICAN INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS
## CLAIM REPORTING

If you are experiencing a data breach or believe you have experienced a data breach, please immediately report a new claim under this policy to:

### MARKEL CYBER SUPPORT HOTLINE

A live operator will connect you with breach response counsel. Markel claims and breach response counsel can deploy services and resources to rapidly address a policy event.

### Phone: 844-462-7535 (844) 4MARKEL

For all other claim reporting that does not require immediate assistance, please report a new claim under this policy to:

### newclaims@markelcorp.com

For general claims inquiries after a claim has been reported, please email:

### markelclaims@markelcorp.com

In order for us to expedite the handling of your claim and quickly refer it to the appropriate party, please have the following information available:
- Claim number (or report as new)
- Your name, contact information and position with the Named Insured
- Date of loss
- Policy number and insured name
- Details of loss

Our address and additional contact information are as follows:
Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Phone: 800-362-7535 (800) 3MARKEL
Fax: 855-662-7535 (855) 6MARKEL

Markel understands the importance of having knowledgeable claims professionals prepared to answer your questions with personal attention and expertise. With claims professionals located across four times zones, you are sure to find the claims assistance you need -- when you need it.

**PLEASE REFER TO THE POLICY FOR ANY NOTICE AND REPORTING PROVISIONS
AND DUTIES IN THE EVENT OF LOSS OR DAMAGE TO COVERED PROPERTY.**

# Markel American Insurance Company



## INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY DECLARATIONS

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY PROVIDES COVERAGE ONLY FOR WRONGFUL ACTS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.

THE AMOUNTS INCURRED AS DEFENSE EXPENSES WILL REDUCE THE LIMIT OF LIABILITY, UNLESS THE POLICY IS AMENDED BY ENDORSEMENT.

PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT WITH YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS IN THIS POLICY.

POLICY NUMBER: FP83837C                    RENEWAL OF POLICY: FP83837B

Named Entity and Mailing Address (No., Street, Town or City, County, State, Zip Code)
Meyers Financial Services, Inc.
670 W Napa St, Ste C
Sonoma, CA 95476

Policy Period: From   12/30/2018   To   12/30/2019   at 12 01 A.M Standard Time at the address of the Named Entity shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Limits Of Liability And Retentions | | | | |
|---|---|---|---|---|
| **Insuring Agreement** | **Limits Of Liability** | | **Retentions** | |
| Coverage 1 Investment Adviser Professional Liability Insurance: | $1,000,000 | Each Loss | $5,000 | Each Loss |
| Coverage 2 Professional Liability Insurance: | $1,000,000 | Each Loss | $5,000 | Each Loss |
| Coverage 3.a. Directors And Officers Liability Insurance: | | Each Loss | Not Applicable | |
| Coverage 3.b. Directors And Officers Liability Insurance: | | Each Loss | | Each Loss |
| Coverage 3 c  Directors And Officers Liability Insurance: | | Each Loss | | Each Loss |
| **Aggregate Limit Of Liability:** 1,000,000 | All losses under all purchased Insuring Agreements combined | | | |

| Producer Number, Name and Mailing Address |
|---|
| KR Golsan Inc |
| 10998 SW 68th Parkway |
| Portland, OR 97223 |

**MDPL 1002 07 17**

## Employment Practices Liability

This Policy includes this Coverage only if designated below by "X" as purchased  If the Coverage is not expressly designated as purchased, this Policy does not include this Coverage.

| Coverage | Limits Of Liability | Retentions |
|---|---|---|
| ☐ Employment Practices Liability | Not Covered | Not Covered    Each Claim |
| ☐ Wage And Hour Claims | Not Covered   Aggregate | Not Applicable |
| ☐ Third Party Discrimination Liability | Not Covered | Not Covered    Each Claim |

## DataBreach℠ Network And Information Security And Media Injury Liability Coverage

This Policy includes only those Coverages designated below by "X" (☒) as purchased  If Coverage is not expressly designated as purchased, this Policy does not include such Coverage

| Coverage | Limits Of Liability | | Deductible (Retention) | | Retroactive Date |
|---|---|---|---|---|---|
| ☒ Network And Information Security Liability: | $500,000 | Each Claim | $10,000 | Each Claim | 02/18/2019 |
| | $500,000 | Aggregate | | | |
| Regulatory Fines· | $25,000 | Each Claim | $0 | Each Claim | 02/18/2019 |
| | $25,000 | Aggregate | | | |
| ☒ Media Injury Liability· | $500,000 | Each Claim | $5,000 | Each Claim | 02/18/2019 |
| | $500,000 | Aggregate | | | |
| ☒ Network Security Loss | $500,000 | Each Unauthorized Access | $5,000 | Each Unauthorized Access | 02/18/2019 |
| | $500,000 | Aggregate | | | |
| Network Security Business Interruption Loss· | $500,000 | Each Business Interruption Event | 24 Hours | Retention Period For Each Business Interruption Event | 02/18/2019 |
| | $500,000 | Aggregate | | | |
| ☒ Breach Mitigation Expense. | $500,000 | Each Unintentional Data Compromise | $2,500 | Each Unintentional Data Compromise | 02/18/2019 |
| | $500,000 | Aggregate | | | |
| ☒ PCI Assessments· | $25,000 | Each Payment Card Breach | $0 | Each Payment Card Breach | 02/18/2019 |
| | $25,000 | Aggregate | | | |
| ☒ Funds Transfer Fraud Loss: | $250,000 | Each Funds Transfer Fraud Incident | $25,000 | Each Funds Transfer Fraud Incident | 02/18/2019 |
| | $250,000 | Aggregate | | | |
| ☐ Social Engineering Loss | Not Covered | Each Social Engineering Incident | Not Covered Each Social Engineering Incident | | |
| | Not Covered | Aggregate | | | |
| Combined Network And Information Security And Media Injury Liability Coverage | | | $500,000 | | Combined Aggregate |

| Additional And Supplementary Payments | |
|---|---|
| Coverage | Limits Of Liability |
| Additional Payment Loss Control And Investigative Expenses: | $10,000 |
| Supplementary Payments | |
| Regulatory Investigation Expenses and Subpoena Expense: | $10,000 |

| Pending And Prior Proceeding Date |
|---|
| Pending And Prior Proceeding Date: 12/30/2016 |

| Extended Reporting Period | |
|---|---|
| Additional Premium: 100% OF POLICY PREMIUM | Additional Period: 12 Months |

| Policy Premium | |
|---|---|
| $4,433 | Payable at inception |
| $4,433 | |

| Endorsements |
|---|
| Forms and Endorsements applying to this Policy and made part of this Policy at time of issue: See MDIL 1001 Attached. |

**These Declarations, together with the Policy, Endorsement(s), Application, and any other attachments complete the above numbered Policy.**

Countersigned: _____  By: _____
                  02/19/2019
                     DATE              AUTHORIZED REPRESENTATIVE

POLICY NUMBER  FP83837C



# Markel American Insurance Company

## FORMS SCHEDULE

| Form Number | Form Name |
|---|---|
| EO Marketing Letter 08 18 | EO Marketing Letter 08 18 |
| MJIL 1000 06 10 | Signature Page |
| MPIL 1073-CA 05 14 | California Premium Refund Disclosure Notice |
| MPIL 1116 08 18 | Notice To Policyholders Claim Reporting |
| MDPL 1002 10 17 | Investment Adviser, Professional Services And Directors And Officers Liability Declarations |
| MPL 0002 07 17 | Investment Adviser, Professional Services And Directors And Officers Liability Policy |
| MPL 1216 07 17 | Certified Acts Of Terrorism |
| MPL 1220 07 17 | Databreach Network And Information Security And Media Injury Liability Coverage |
| MPL 1224 07 17 | Life Product Sales Coverage - Named Individuals |
| MPL 1231 07 17 | Schedule Of Professional Service Providers |
| MPL 1232 07 17 | Supplemental Coverage Extension |
| MPL 1478-CA 07 17 | California Amendatory |

PROFESSIONAL LIABILITY

**MARKEL®**

# MARKEL AMERICAN INSURANCE COMPANY

## INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY PROVIDES COVERAGE ONLY FOR CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.

THE AMOUNTS INCURRED AS DEFENSE EXPENSES WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE, UNLESS THE POLICY IS AMENDED BY ENDORSEMENT. PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT WITH YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.

Throughout this Policy, the words "Named Entity" refer to the Named Entity shown in the Declarations. The word "Insurer" refers to the Company providing this insurance.

Some words that appear in **bold** typeface have special meaning. Refer to Section **II** – Definitions.

### SECTION I – COVERAGE

#### A.  Insuring Agreements

The Insurer, relying on the statements in the **application**, agrees with the Named Entity as follows:

Coverage is provided under the following Insuring Agreement(s) only if a Limit Of Liability for such Insuring Agreement(s) is shown in the Declarations

##### 1.  Investment Adviser Professional Liability Insurance

The Insurer will pay, on behalf of an **insured adviser** or its **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

##### 2.  Professional Liability Insurance

The Insurer will pay, on behalf of an **accounting firm, life and health insurance agency** or **professional service provider** or their **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable

##### 3.  Directors And Officers Liability Insurance

a.  The Insurer will pay, on behalf of the **insured executives**, **loss** which the **insured executives** become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable, and for which the Named Entity or **insured entity** has not indemnified them. This Paragraph a. does not apply to **loss** which the Insurer pays pursuant to Paragraph **b.** of this Insuring Agreement **3**.

b.  The Insurer will pay, on behalf of an **insured entity**, **loss** which the **insured entity** has indemnified the **insured executives**, and which the **insured executives** have become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

c.  The Insurer will pay, on behalf of an **insured entity**, **loss** for which the **insured entity** becomes legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

MPL 0002 07 17

**B. Additional Payment Loss Control And Investigative Expenses**

If, during the Policy Period or Extended Reporting Period, if applicable, the **insured** provides the Insurer with written notice of a **wrongful act** that is reasonably expected to result in a **claim** but as to which no **claim** has yet been made, the Insurer may, at its sole option, choose to investigate the **wrongful act** Such an investigation will be at the Insurer's expense and will not reduce the applicable Limits Of Liability or be subject to the Retention provisions of this Policy until one of the following occurs:

1. A **claim** results from the **wrongful act** under investigation, or

2. The Insurer incurs $10,000 in expenses, unless a higher limit is shown in the Declarations, arising from the investigation

If a **claim** is made and reported to the Insurer, or once the Insurer incurs $10,000 in investigative expense, unless a higher limit is shown in the Declarations, any further payment will be considered **defense costs** and will reduce the applicable Limits Of Liability and be subject to the Retention provisions of this Policy.

**C. Supplementary Payments**

The Insurer will pay up to $10,000, unless a higher limit is shown in the Declarations, for the sum of all **regulatory investigation expenses** or **subpoena expense** incurred by the **insured**

These payments are in addition to the Limits Of Liability and will not be considered as payment of **loss** or **defense costs** The Retention does not apply to these payments.

**SECTION II – DEFINITIONS**

A. **Accounting firm** means any entity specifically listed on the Schedule Of Accounting Firms endorsement to this Policy that renders **accounting services**, but only while such entity is acting on behalf of the Named Entity.

B. **Accounting service(s)** means any services specialized in accounting and specifically listed on the Schedule of Accounting Firms endorsement pursuant to a written agreement between the **accounting firm** and an **insured** for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **accounting firm**

C. **Application** means each and every signed application, any attachments to such applications, or other materials or documents submitted or incorporated in connection with the underwriting of this Policy and includes the underwriting of any other investment advisory liability policy, life and health insurance policy, professional service liability policy, miscellaneous errors and omissions policy, bookkeepers policy, accountants policy or director or officer policy issued by the Insurer, or any of its affiliates, of which this Policy is a renewal, replacement or which it succeeds in time It will also mean any public documents filed within 12 months of the inception date of this Policy by the Named Entity or any other **insured** with the Securities and Exchange Commission (SEC), or any similar federal, state, local or other regulatory body, domestic or foreign, and any other written public statement or certification required by law to be made regarding the accuracy, completeness or adequacy of the Named Entity's or other **insured's** financial statements, SEC filings or internal controls, whether or not such public documents, statements or certifications were furnished to the Insurer

D. **Broker** will have the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **broker** does not include a person who is a **registered representative**

E. **Claim** means

1. Any demand for monetary damages in a legal action, mediation, arbitration or injunctive relief,

2. A civil proceeding commenced by the service of a complaint or similar pleading;

3. An **execution error**,

4. A criminal proceeding commenced by the return of an indictment, information or similar document;

5. Any administrative or regulatory proceeding commenced by the filing of a notice of charges, service or filing of a complaint, receipt of a Wells Notice or receipt or filing of any other pleading or document similar or comparable to the foregoing;

6. Any investigation of the **insureds** initiated by any governmental body or self-regulatory organization after service of a subpoena, Wells Notice, "target letter" (within the meaning of Title 9, §11 151 of the United States Attorney's Manual), civil investigative demand or other notice of investigation or other similar document or notification;

7. Any written request to toll or waive any statute of limitations commenced by the receipt of such request;

**8.** Any written request or other written statement seeking extradition or rendition of an **insured** commenced by the receipt of such written request or statement; or

**9.** Any foreign equivalent of any of the foregoing;

made upon an **insured** for a **wrongful act**.

**F. Dealer** will have the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **dealer** does not mean a person who is a **registered representative**.

**G. Defense cost(s)** means reasonable and necessary fees, costs, charges, and expenses incurred in the investigation, defense or appeal of any **claim** and the costs of appeal, attachment or similar bonds (but does not include applying for or furnishing such bond).

**Defense costs** do not include fees, salaries, regular or overtime wages, overhead, benefit or extradition expenses.

**H. Electronic communications system** means any wired, wireless, radio, electromagnetic, photo-optical or photo-electronic facility for the transmission of electronic communications; any electronic data processing systems or related electronic equipment for the storage of such communications; or any computer.

**I. Electronic data** means facts or information converted to a form usable in an **electronic communications system** and which is stored for use by computer programs.

**J. ERISA** means the Employee Retirement Income Security Act of 1974, the Pension Protection Act of 2006, as amended and any rules or regulations promulgated thereunder.

**K. Execution error** means any **claim** based upon, arising out of, or relating to the erroneous execution or failure to execute an order to transfer, purchase or sell **securities** by an **insured**.

**L. Financial impairment** means the status of an **insured entity** resulting from:

    **1.** The appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **insured entity**; or

    **2.** Becoming a debtor in possession under United States bankruptcy law or the equivalent under the law of another jurisdiction, including the law of another country.

**M. Forged** means the signing of the name or electronic manipulation of the name of another natural person with the intent to deceive, but does not mean a signature which consists in whole or in part of one's own name, with or without authority, in any capacity for any purpose.

**N. Fraudulent transfer request** means an email or other instruction fraudulently declared to have been sent by a customer but which communications were either not sent by such customer or were **forged**, fraudulently modified during physical transit of electronic media to the **insured** or during electronic transmission to the **insured's electronic communications system**.

**O. Insured(s)** means the Named Entity, **insured entity(ies)** and the **insured person(s)**

**P. Insured adviser(s)** means the Named Entity that is a registered "investment adviser" as defined in the Investment Advisers Act of 1940, and its amendments, and which renders **investment advisory services** to others.

**Q. Insured entity(ies)** means the **accounting firm(s)**, **insured adviser(s)**, **life and health insurance agency(ies)** or **professional service provider(s)**.

**R. Insured executive(s)** means any person who has been, now is or becomes a duly elected or appointed partner, director, officer, manager or trustee of an **insured entity**.

**S. Insured person(s)** means:

    **1.** The **insured executives**;

    **2.** Any person who has been, now is or will become an employee of an **insured entity**, but solely while providing **accounting services**, **investment advisory services**, **life and health services** or **professional services** on behalf of such **insured entity**,

    **3.** The estates, heirs, or legal representatives of any person described in Paragraphs **1.** and **2.** above in the event of their death, incompetency, insolvency or bankruptcy; or

    **4.** The lawful **spouse** of any person described in Paragraphs **1.** and **2.** above, but solely with respect to a **claim** arising solely out of his or her status as the **spouse** of such person described in Paragraphs **1.** and **2.** above;

provided, however, an **insured person** does not include a lawful **spouse** with respect to a **claim** against such person for his or her own **wrongful acts**.

**Insured person** does not include independent contractors unless specifically endorsed by name to this Policy.

T. **Interrelated wrongful acts** means **wrongful acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes, including, but not limited to a Pyramid Scheme or Ponzi Scheme. As used herein, a Pyramid Scheme means an investment program in which investors are paid returns primarily through the enrollment of others into the program. As used herein a Ponzi Scheme means an investment program in which investors are paid returns primarily out of the money paid by subsequent investors in the program.

U. **Investment advisory services** means financial, economic or investment advice regarding investments or investment management services performed or required to be performed by an **insured adviser** for or on behalf of a customer pursuant to a written agreement between such customer and the **insured adviser** for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **insured adviser**. **Investment advisory services** includes financial planning services.

V. **Life and health insurance agency** means any entity specifically listed on the Schedule of Insurance Agencies endorsement to this Policy that renders **life and health services**, but only while such entity is acting on behalf of the Named Entity.

W. **Life and health services** means any **life insurance agent** duties performed or required to be performed in the regular course of business for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **life insurance agent**.

X. **Life insurance agent** means an individual licensed, as required by any applicable Federal law and the law of the state where any part of the transaction occurs, to sell life, health, disability, fixed annuities, long term care or accidental death and dismemberment insurance, including activities as a licensed life insurance consultant. **Life insurance agent** does not include anyone selling **non-traditional life insurance products** or anyone while acting as a general agent or in any similar capacity for a life insurance company.

Y. **Loss** means the amount that an **insured** becomes legally obligated to pay on account of any **claim**, including but not limited to, damages (including punitive, exemplary, or multiplied damages, unless uninsurable under the law of the jurisdiction most favoring coverage for such damages), judgments, settlements, pre-judgment and post-judgment interest and **defense costs**

**Loss** does not include.

1. Any costs incurred by an **insured** to comply with any order for injunctive or other non-monetary relief, any agreement to provide such relief or any regulatory or administrative directive,

2. Taxes imposed on an **insured**, fines or penalties, except as provided above with respect to punitive, exemplary, or multiplied damages,

3. Any amount not insurable under the law pursuant to which this Policy is construed, except as provided above with respect to punitive, exemplary or multiplied damages;

4. Regular or overtime wages, salaries, commissions, or fees of **insured persons**; or

5. Any fees, charges, commissions or other compensation paid to an **insured**, including allegedly excessive or improper fees.

Z. **Non-traditional life insurance products** means viatical agreements, private placement life insurance products, life settlements, life settlement-backed securities (death bonds), senior settlements and any product originally issued in relation to a structured settlement, including but not limited to structured settlement factoring transactions as defined in the Internal Revenue Code

AA.**Personal injury** means false arrest, wrongful detention or imprisonment, malicious prosecution, abuse of process, defamation, disparagement (including libel and slander), invasion of privacy, invasion of the right of private occupancy, or wrongful entry or eviction.

BB.**Pollutants** means, but is not limited to, any solid, liquid, gaseous, or thermal irritant or contaminant, including without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, mold, fungi odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products, waste and any electric, magnetic or electromagnetic field of any frequency.

**CC. Private data** means data containing:

1. An individual's driver's license or other state-issued identification number; social security number; unpublished telephone number; savings account, checking account, credit card or debit card number each when in combination with the security code, access code, password or pin for such account or card number;

2. Nonpublic personal information as defined in the Gramm-Leach-Bliley Act of 1999 (GLBA), as amended, and regulations issued pursuant thereto;

3. Protected healthcare information as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto, and medical and healthcare information;

4. Private personal information as defined under a **security breach notice law**; and

5. Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information,

not including any lawfully available data accessible by the general public.

**DD. Pro bono** means **accounting services, investment advisory services, life and health services** or **professional services** done for the public good and benefit, voluntarily and without payment.

**EE. Professional service(s)** means services rendered for or advice given to others by an **insured** for a fee, remuneration, **pro bono** or other consideration in an **insured's** business and explicitly listed on the Professional Service Providers endorsement to this Policy.

**FF. Professional service provider** means any individual or entity specifically listed on the Schedule of Professional Service Providers endorsement to this Policy that renders **professional services**, but only while such individual or entity is acting on behalf of the Named Entity.

**GG. Registered representative** means a person who:

1. Is registered with the Financial Industry Regulatory Authority (FINRA) or its successor as a **registered representative** of a **broker** or **dealer** pursuant to the provisions of the Securities Exchange Act of 1934; and

2. Is in the business of buying and selling **securities** for the account of others, including but not limited to, direct participation products such as limited partnerships, shares in mutual funds, unit investment trusts and variable annuities.

**Registered representative** does not include any person while acting in the capacity of a principal of a **broker** or **dealer**, including but not limited to a General Securities Principal or Limited Principal General Securities Sales Supervisor.

**HH. Regulatory investigation expenses** means attorney fees, attorney costs and court costs if, during the Policy Period, the **insured** becomes involved in an investigation or an administrative, arbitration or regulatory proceeding commenced by the filing of a notice of charges, investigative order, or subpoena that

1. Is initiated by a federal, state or self-regulatory agency;

2. Results from an act or omission in the rendering of **accounting services, investment advisory services, life and health services** or **professional services,**

3. Is reported in accordance with the terms and conditions of this Policy; and

4. Is first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

**II. Security** has the meaning assigned to that term by the following:

1. The Securities Exchange Act of 1934;

2. The Securities Act of 1933;

3. The Investment Advisers Act of 1940 as amended; or

4. Any rules issued by the Securities Exchange Commission pursuant to any of these acts.

**Securities** means the plural of **security** as defined herein

**JJ. Security breach notice law** means any law, statute or regulation within the United States of America, its territories or possessions, Puerto Rico or Canada requiring the Named Entity to notify individuals of the compromise or possible

compromise of the security of their confidential information in the Named Entity's care, custody or control; the European Union (EU) Data Protection Act of 1995; and the General Data Protection Regulation

**KK.Spouse** means a person related by marriage or party to a civil union or domestic partnership recognized under any applicable federal, state or local law.

**LL. Subpoena expense** means costs and fees associated with:

1. An **insured** responding to a subpoena; and

2. The Insurer assisting an **insured** in responding to a subpoena;

that an **insured** receives during the Policy Period and which:

    **a.** Arises from a lawsuit in which an **insured** is not named as a defendant; or

    **b.** Summons an **insured** to provide documents or testimony for an **insured** witnessing of an act or omission of **accounting services, life and health services** or **professional services**. This coverage does not apply if an **insured** is summoned solely for providing advice or expert testimony.

    The Insurer's assistance will include, at an **insured's** request.

        **(1)** Providing or assisting in the retention of an attorney to prepare an **insured** for giving sworn testimony;

        **(2)** Providing an **insured** with advice regarding the production of documents; or

        **(3)** Representing an **insured** at the hearing.

**Subpoena expense** does not include salary, wages, overhead, benefit expenses or expenses of partners, principals, officers, directors, members or employees of the **insured** or the Insurer.

**MM.Unauthorized access** means a breach of the Named Entity's **electronic communications system**, including:

1. Any intentional violation, interception, or use or misuse of the Named Entity's **electronic communications system**, whether or not for profit or gain, by any person, without the permission, knowledge or ratification of the **insured**;

2. Access to the Named Entity's **electronic communications system** that is with the **insured's** permission where such permission is the result of fraud or deception, including phishing scams;

3. Use of the Named Entity's **electronic communications system** by a party, including but not limited to a rogue employee, authorized by the **insured** to use such system, who does so for an unauthorized purpose;

4. The introduction of viruses, malware, or other programs into the Named Entity's **electronic communications system** which contain fraudulent or destructive instructions or code including any inadvertent transmission of such programs to a third party;

5. A credible threat or an extortion demand, including but not limited to a threat or demand by ransomware, received by the **insured** threatening or portending loss, injury or damage to:

    **a.** The Named Entity's **electronic communications system**, including programs, **electronic data** and media which form a part of the Named Entity's **electronic communications system**; or

    **b.** Money, securities, bonds or similar financial instruments, solely to the extent that record of such is maintained in digital or electronic format on the Named Entity's **electronic communications system**;

    for the purpose of extorting money or other valuable consideration from the Named Entity; or

6. Failure to prevent a denial of service attack on the Named Entity's **electronic communications system** or to prevent the use of the Named Entity's **electronic communications system** by an unauthorized user or code to launch a denial of service attack on a third party.

**NN.Unintentional data compromise** means

1. Any computer security incident, intrusion, breach, compromise, theft, loss or misuse of **private data** maintained by the Named Entity, including the theft or loss of any paper records;

2. The failure of any third party to prevent the unauthorized viewing, copying or distribution of **private data** which the Named Entity has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the **private data** so entrusted; or

3. Unintentional breach of the Named Entity's written privacy policy.

**OO.Wrongful act** means:

1. With respect to Insuring Agreement **1.** Investment Adviser Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured adviser** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **investment advisory services**,

2. With respect to Insuring Agreement **2.** Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any:

   a. **Accounting firm** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **accounting services**;

   b. **Life and health insurance agency** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **life and health services**,

   c. **Professional service provider** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **professional services**;

3. With respect to:

   a. Insuring Agreement **3.a.** and **3.b.** Directors And Officers Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured executive**, solely in his or her capacities as such, or any matter claimed against an **insured executive** solely by reason of their status as **insured executives**, and

   b. Insuring Agreement **3.c.** Directors And Officers Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by an **insured entity**

## SECTION III – EXCLUSIONS

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

A. Any:

1. **Insured** gaining any profit, remuneration or pecuniary advantage to which they were not legally entitled, including but not limited to, any remuneration to an **insured** not properly approved by any shareholders; or

2. Deliberately fraudulent, dishonest or criminal actions of an **insured**;

provided, however, that any of the above is established by admission of an **insured** in writing or a final, non-appealable adjudication in the underlying action.

For the purpose of determining the applicability of this exclusion, knowledge possessed by any **insured person** will not be imputed to any other **insured person**, but knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer, comptroller or general counsel (or equivalent position) of the Named Entity or an **insured entity** will be imputed to any **insured entity**

B. Any **wrongful act** or any matter, fact, circumstance, situation, transaction, cause or event and **interrelated wrongful act** which has been the subject of any notice given under any prior policy of which this Policy is a renewal or replacement or which it may succeed in time.

C. Any demand, suit, proceeding, investigation or **claim** pending as of or made against any **insured** prior to the Pending And Prior Proceeding Date shown in the Declarations; or

Any **wrongful act** or matter, fact, circumstance, situation, transaction, cause or event and **interrelated wrongful act**, regardless of the legal theory upon which demand, suit, proceeding, investigation or **claim** is predicated

D. Any actual or alleged act or omission of **insured persons** serving as, or any **insured person's** status as, a director, officer, trustee, governor, manager, general counsel or risk manager of any organization other than an **insured entity**, regardless of whether an **insured** directed or requested such an **insured person** to serve in such other position or capacity

MPL 0002 07 17                                                                                                                Page 7 of 14

E. Any **claim** by, or on behalf of, or in the right of (whether such right is transferred or assigned by operation of law or otherwise) any **insured**; provided, however, this exclusion does not apply to:

   1. Any derivative action on behalf of the **insured entity** or any shareholder class action where such action is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **insured**; or

   2. Under Insuring Agreement **3.** Directors And Officers Liability Insurance, any **claim** against an **insured executive** brought by an **insured person** who is not an **insured executive** for wrongful termination of employment or other unfair employment practice with respect to such **insured person** bringing such **claim**.

F. Any.

   1. Bodily injury, sickness, disease, or death of any person, including any emotional distress, mental anguish, outrage, or humiliation associated with such bodily injury, sickness, disease or death;

   2. **Personal injury**, trespass, nuisance, assault, battery, or loss of consortium, or

   3. Damage to or destruction of any tangible or intangible property including loss of use.

Paragraph **1.** of this exclusion does not apply to a **claim** for emotional distress or mental anguish arising solely from the rendering of or failure to render **accounting services**, **life and health services**, **professional services** and **investment advisory services**.

Paragraphs **1.**, **2.** and **3.** of this exclusion do not apply to any libel, slander, oral or written publication of defamatory or disparaging material committed by an **insured** in the performance of professional services otherwise covered by this Policy.

G. Any discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time, or any request, demand or order to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**, including but not limited to a **claim** alleging damage to the **insured entities**, their **security** holders, or their creditors.

However, this exclusion does not apply to **loss** that would otherwise be covered under Insuring Agreement **3.a.** Directors And Officers Liability Insurance for a **claim** brought derivatively on behalf of an **insured entity** by a **security** holder or member of an **insured entity**.

H. Violation of any of the responsibilities, obligations or duties imposed upon fiduciaries under **ERISA**, its amendments or any similar provisions of state or foreign statutory or common law in connection with any pension, employee benefit or welfare plan or trust established or maintained for the purpose of providing benefits to the employees of an **insured entity** or the Named Entity.

I. Breach of contract, provided, however, this exclusion does not apply to any **claim** for rendering or failing to render **investment advisory services**, **accounting services**, **life and health services** or **professional services**.

J. Any:

   1. Activities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**;

   2. Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had an equity interest in the issuer of such **securities**, or

   3. Investment banking, leveraged buyouts, going private transactions, fairness opinions, mergers, acquisitions, restructurings, divestitures, **securities** offerings, syndications, underwriting or similar activities.

K. The inability of any bank or banking firm, **broker** or **dealer** in **securities** or commodities, or any other person or entity, to make any payment by or to settle or effect any transaction of any kind.

L. **Unauthorized Access** to the **insured's electronic communications system**.

M. Any obligations or duties imposed under a workers' compensation, disability benefits or unemployment compensation law or any similar law or regulation.

N. Any refusal or failure to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, sexual harassment, humiliation, discrimination, or other employment-related torts including, but not limited to, wrongful termination, failure or refusal to hire or promote, wrongful discipline; wrongful reference, deprivation of a career opportunity, demotion or adverse change in terms, conditions or status of employment;

**MPL 0002 07 17**                                                              **Page 8 of 14**

wrongful failure to grant tenure; humiliation; retaliation for asserting a legal right, workplace harassment including, without limitation offensive, intimidating, coercive or unwelcome conduct, advances, contact or communications, negligent hiring, retention, supervision, training or performance evaluation, and employment-related misrepresentation, defamation, or invasion of privacy or infliction of emotional distress

O. Any **unintentional data compromise**.

P. Any services rendered during the period of any suspension or revocation of an **insured's** certification, licensure, accreditation, appointment or other right to practice **accounting services**, **investment advisory services**, **life and health services** or **professional services**.

Q. Activities as a partner, principal, officer, director, manager, member, employee, independent contractor or administrative staff of any organization or public office other than the Named Entity or an organization specifically endorsed by name onto this insurance

R. Any **claim** involving the amount of, return of, disgorgement of or reimbursement of fees, commissions or other sums paid to an **insured** for **accounting services, investment advisory services, life and health services** or **professional services** rendered by an **insured**, provided, however, that this exclusion will not apply to **defense costs**

S. Any funds transfer fraud:

1. Arising out of **accounting services, investment advisory services, life and health services** or **professional services**, and

2. Resulting directly from the **insured** having authorized or transferred, paid or delivered any funds, established any credit, debited any account or given any value on the faith of a **fraudulent transfer request**

T. Any:

1. Disallowed deduction(s), credit(s) or other item(s) on a tax return; or

2. Taxes owed by a customer

U. Any actual or alleged violation of the Fair Labor Standards Act (except the Equal Pay Act) or any other law concerning wage and hour practices, including but not limited to any law addressing off-the-clock work, providing rest or meal periods, reimbursement of expenses, classification of employees as exempt or non-exempt, timely payment of wages, conversions, unjust enrichment, or unfair business practices

V. Any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by an **insured** in their capacities as such in connection with any actual or alleged violation of any law or public policy concerning discrimination or harassment against anyone who is not an **insured**

## SECTION IV – LIMITS OF LIABILITY AND RETENTIONS

### A. Limits Of Liability

#### 1. Aggregate Limit Of Liability

The Aggregate Limit Of Liability shown in the Declarations is the Insurer's aggregate liability for all **loss**, in excess of the applicable Retention, under all Coverages combined for all **claims** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable, and reported in writing to the Insurer pursuant to Section **VI** – Notice.

#### 2. Insuring Agreement Limit Of Liability

Subject to the Aggregate Limit Of Liability, the applicable Insuring Agreement Limit Of Liability shown in the Declarations is the Insurer's maximum liability for all **loss** under each insuring agreement, in excess of the applicable Retention, for each **claim** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable, and reported in writing to the Insurer pursuant to Section **VI** – Notice.

#### 3. Interrelated Wrongful Acts

All **claims** for the same **wrongful act** or **interrelated wrongful acts** will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as having been made in accordance with Section **VI** – Notice, whichever is earliest, whether before or during the Policy Period

MPL 0002 07 17

**Defense costs** are part of, not in addition to, the applicable Limit Of Liability Such **defense costs** will reduce the applicable Limit Of Liability and will be applied against the Retention. The Insurer will have no obligation to pay any **loss** or to defend or continue to defend any **claim** or to pay **defense costs** after the applicable Limits Of Liability have been exhausted by payment of **loss** or **defense costs**.

**B. Retention**

1. The Insurer will pay only that portion of any **loss** which is in excess of the applicable Retention for each Insuring Agreement shown in the Declarations, up to the applicable Limit Of Liability shown in the Declarations. A Retention will apply to each and every **claim**, and such Retention will be borne by the **insureds** uninsured and at their own risk.

2. No Retention will apply to **loss** incurred by an **insured executive** if such **loss** cannot be indemnified by the Named Entity or **insured entity** because the Named Entity or **insured entity** is not permitted or required to indemnify, or is not financially able to indemnify by reason of **financial impairment**. The Insurer's liability for all other covered **loss** will apply only to that part of **loss** on account of each **claim** which is excess of the applicable Retention shown in the Declarations.

3. If different parts of a single **claim** are subject to different Retentions, the applicable Retention will be applied separately to each part of the **claim**. The sum of the Retentions will not exceed the largest applicable Retention.

**SECTION V – INDEMNIFICATION**

**A.** If the **insured entity**:

1. Is permitted or required by law to indemnify the **insured persons** for **loss** or to advance **defense costs** on their behalf; and

2. Fails or refuses to do so other than for reason of **financial impairment**;

then, any payment by the Insurer of such **loss** or **defense costs** will be subject to the single highest applicable Retention shown in the Declarations.

**B.** The **insured entity** will be deemed to provide indemnification to the **insured persons** for such **loss** or advancement of such **defense costs** to the fullest extent permitted or required by law and hereby agrees to indemnify the **insured persons** for such **loss** or to advance such **defense costs** to the fullest extent permitted or required by law, including the making in good faith of any required application for court approval for such payment.

**C.** If the **insured entity** is unable to fully indemnify the **insured persons** for **loss** or to advance **defense costs** for reasons of **financial impairment**, the **insured entity** will be deemed to provide indemnification for such **loss** or advancement of such **defense costs** to the fullest extent permitted or required by law, including the making in good faith of any required application for court approval for such payment, and the Insurer will pay such **loss** or advance such **defense costs** regardless of whether some or all of the Retention is unpaid; provided, however, that the Insurer will only be required to make such payments if the appropriate court approval has been obtained, including but not limited to, any "comfort order" in the event of bankruptcy or insolvency. The **insureds** will cooperate fully with the Insurer in making any application for court approval that may be necessary or filing appropriate motions for a "comfort order" in the event of **financial impairment**.

**SECTION VI – NOTICE**

**A.** The Named Entity will, as a condition precedent to the obligations of the Insurer under this Policy, give written notice to the Insurer of a **claim** made against an **insured** as soon as practicable after the Named Entity's risk manager, or general counsel or functional equivalent first becomes aware of the **claim**, but in all events no later than either:

1. The end of the Policy Period or the Extended Reporting Period, if applicable; or

2. Within 60 days after the end of the Policy Period or the Extended Reporting Period, if applicable, as long as such **claim** was first made against an **insured** within the final 60 days of the Policy Period or the Extended Reporting Period, if applicable.

**B.** If, during the Policy Period, an **insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **claim** being made against an **insured** and gives written notice to the Insurer of the circumstances, the anticipated allegations of the **wrongful act** and the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** subsequently made against the **insured** and reported to the Insurer for any **wrongful act** or **interrelated wrongful acts** will be deemed to have been made at the time such notice was received by the Insurer under this provision.

**C.** All notices under this Policy will be provided to the Insurer shown in the Declarations and will refer to the Policy Number. The notices will be in writing and sent by mail, electronic mail, prepaid express courier or facsimile to the address shown in the Policyholder Notice.

**D.** Notice will be effective on the date of receipt by the Insurer

## SECTION VII – DEFENSE COSTS, SETTLEMENT AND COOPERATION

**A.** The Insurer will have the right and duty to defend the **insured** and investigate any **claim** as a result of a **wrongful act** brought against the **insured** and to which this insurance applies, even if such **claim** is groundless, false or fraudulent, pursuant to the following provisions:

1. The Insurer will select defense counsel; provided, however, that if the law of the state of the Named Entity's domicile, shown in the Declarations, allows the **insured** to control the selection of defense counsel where a conflict of interest has arisen between the **insured** and the Insurer, the Insurer will provide a list of attorneys or law firms from which the **insured** may designate defense counsel who will act solely in the **insured's** interest, and the **insured** will direct such defense counsel to cooperate with the Insurer. Such cooperation will include:

   **a.** Providing to the Insurer on a regular basis, but not less frequently than every 3 months, written reports on claimed **loss**, damages, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the **claim**;

   **b.** Providing any other reasonable information requested;

   **c.** Fully itemized billing on a periodic basis; and

   **d.** Cooperating with the **insured** and Insurer in resolving any discrepancies.

2. The Insurer will not settle any **claim** without the **insured's** prior written consent, but the Insurer will have at all times the right to recommend a settlement of any **claim**.

3. The **insured** will not, with respect to any **claim** covered under this insurance, except at the **insured's** own cost, make payment, admit any liability, settle any **claim**, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur any **defense costs** without the Insurer's prior written consent, such consent not to be unreasonably withheld. The **insured** must take all reasonable action within the **insured's** ability to prevent or mitigate any **loss** or **claims**. Any costs and expenses incurred by the **insured** prior to giving written notice of the **claim** to the Insurer will be borne by the **insured** and will not constitute satisfaction of the Retention

4. The **insured** will cooperate with the Insurer and do whatever is necessary to pursue any right of indemnity, contribution or apportionment which the **insured** may have. Upon the Insurer's request, the **insured** will:

   **a.** Submit to examination and interview by an Insurer's representative, under oath if required;

   **b.** Attend hearings, depositions, and trials,

   **c.** Assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the defense of **claims**;

   **d.** Give a written statement or statements to the Insurer's representative(s) and meet with such representative(s) without cost to the Insurer for the purpose of determining whether there is coverage under this Policy, and

   **e.** Assist in any obligation the Insurer may have to investigate or defend a **claim**.

**B.** No coverage is provided for **claims** against the Named Entity or an **insured entity** in any respect under Insuring Agreement **3.** Directors And Officers Liability Insurance except to the extent of indemnification of **insured executives** by the Named Entity or **insured entity** under Insuring Agreement **3.b.** Directors And Officers Liability Insurance

## SECTION VIII – EXTENDED REPORTING PERIOD

**A.** If the Insurer refuses to renew this Policy or the Named Entity cancels or refuses to renew this Policy, the Named Entity has the right, to one or more Extended Reporting Periods, as described below, in which to give to the Insurer written notice of **claims** first made against the **insureds** during the Extended Reporting Period for any **wrongful act** or **interrelated wrongful acts** occurring during the Policy Period and otherwise covered by this Policy.

The right to an Extended Reporting Period does not apply to any cancellation or nonrenewal resulting from non-payment of premium, or as a result of a change in policy terms, conditions, exclusions or premiums.

An Extended Reporting Period does not extend the Policy Period or change the scope of coverage provided.

**B.** The limits of liability applicable to **claims** first made during the Extended Reporting Period are a part of, and not in addition to, the limits of liability for the Policy Period. The Extended Reporting Period will not increase or reinstate this Policy's limits of liability, which is the maximum liability of the Insurer for the Policy Period and Extended Reporting Period combined.

**C.** A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the Policy Period and lasts for 60 days.

**D.** A Supplemental Extended Reporting Period is available for the Additional Period shown in the Declarations, but only upon payment of the Extended Reporting Period Premium shown in the Declarations. This Supplemental Extended Reporting Period starts when the Basic Extended Reporting Period, set forth in Paragraph **C.** above, ends.

There will be no right to a Supplemental Extended Reporting Period unless a written request for this extension, together with the additional premium, is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal.

The additional premium for the Supplemental Extended Reporting Period will be fully earned at the inception of the Supplemental Extended Reporting Period. Once in effect, the Supplemental Extended Reporting Period cannot be cancelled.

## SECTION IX – CANCELLATION

**A.** The first Named Entity may cancel this Policy by surrender thereof to the Insurer or any of its authorized representatives or by mailing or delivering to the Insurer written notice stating when thereafter the cancellation will be effective.

**B.** The Insurer may cancel this Policy for non-payment of premium by mailing or delivering to the first Named Entity written notice of cancellation, at the address shown in the Declarations, at least 10 days before the effective date of cancellation.

**C.** Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

**D.** If the first Named Entity cancels the Policy, the Insurer will send the first Named Entity any premium refund due which will be computed at customary short rates. Premium adjustment may be made at the time cancellation is effected and, if not then made, will be made as soon as practicable after cancellation becomes effective. Mailing of the Insurer's check or the check of its representative will be sufficient tender of any refund of premium due to the first Named Entity.

## SECTION X – CHANGE IN CONTROL

### A. Change In Control Of The Named Entity

Immediately upon the occurrence of any of the following:

1. The Named Entity consolidates with or merges into, or sells all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert;

2. Any person or entity or group of persons or entities acting in concert acquires an amount of the outstanding **securities** representing more than 50% of the voting power for the election of directors of the Named Entity, or acquires the voting rights of such an amount of such **securities**; or

3. The appointment of a receiver, conservator, trustee, liquidator or rehabilitator or any similar official for or with respect to the Named Entity;

(any of the above events are herein referred to as the Transaction)

then, this Policy will continue in full force and effect as to **wrongful acts** occurring prior to the effective date of the Transaction, but there will be no coverage afforded by any provision of this Policy for any actual or alleged **wrongful act** occurring after the effective date of the Transaction.

The Named Entity will give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

However, if the **insured adviser(s)** acquires another entity by merger or consolidation such that:

a. The **insured adviser(s)** is the surviving entity;

b. The regulatory assets under management of the combined entity is less than 125% of the regulatory assets under management of the **insured adviser(s)** prior to the effective date of the Transaction, and

c. There will not be a change in 50% or more of the **insured executives**,

then coverage will continue until the end of the Policy Period and written notice of the Transaction to the Insurer is not required.

## B. Termination Of Coverage After Certain Transactions

If, during the Policy Period, there will be a change in the majority of the **insured executives** of any **insured adviser**, or if any **insured adviser** will be merged, consolidated or otherwise combined with any other entity, then coverage (including, but not limited to, Section VIII – Extended Reporting Period), for any and all **insureds**, with respect to such investment adviser and all of its activities, will not apply to any **wrongful act** occurring subsequent to such change of control.

## SECTION XI – SUBROGATION

In case of payment of **loss** by the Insurer, the Insurer will be subrogated to the amount of such payment to the **insured's** right of recovery against any other person or organization for such **loss**, and the **insured** will execute all papers required, and will do everything that may be necessary to secure and preserve such rights, including the execution of documents that enable the Insurer effectively to bring suit in the name of the **insured**. In no event, however, will the Insurer exercise its rights of subrogation against an **insured** under this Policy unless such **insured** has committed a deliberate criminal act, or deliberate fraudulent act, or obtained any profit or advantage to which such **insured** was not legally entitled, and as to any of the foregoing, only as evidenced by a written statement or written admission by any **insured** or a judgment or other final adjudication in the underlying action or in a separate action, alternative dispute resolution process (including one pursuant to Section XII – Other Insurance) or other proceeding.

Any recovery, after expenses, will be used to reduce the **loss**, and so much of such recovery will be paid to the Insurer as will reduce the **loss** ultimately borne by the Insurer to what it would have been had the recovery preceded any payment of such **loss** by the Insurer.

## SECTION XII – OTHER INSURANCE

This Policy will apply only as excess over any other valid and collectible insurance, whether primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit Of Liability provided by this Policy. This Policy will also be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **claim** for which this Policy may be obligated to pay **loss**.

## SECTION XIII – ARBITRATION

Only if requested by the **insured**, the Insurer will submit any dispute, controversy or **claim** arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree, the arbitration will be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel will consist of one arbitrator selected by the **insured**, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

## SECTION XIV – AUTHORITY

It is agreed that the first Named Entity will act on behalf of its subsidiaries and all **insured entities** and **insured persons** with respect to giving notice of **claim**, giving and receiving notice of cancellation or nonrenewal, the payment of premiums that may become due under this Policy, the payment of the Retention, and the receiving of any return premiums that may become due under this Policy, the receipt and acceptance of any endorsements issued to form a part of this Policy and the exercising or declining to exercise any right to an Extended Reporting Period.

## SECTION XV – ASSIGNMENT

No assignment of interest under this Policy will be valid without the prior written consent of the Insurer.

## SECTION XVI – ACTION AGAINST THE INSURER

No action will lie against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy, and the amount of the **insured's** obligation to pay has been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement will thereafter be entitled to recover under this Policy to the extent of any insurance afforded by this Policy. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **insured** to determine the **insured's** liability, nor will the Insurer be impleaded by the **insured** or the **insured's** legal representative.

**SECTION XVII – REPRESENTATIONS**

By acceptance of this Policy, the Named Entity agrees that the statements in the **application** are its agreements and representations and that this Policy is issued in reliance upon the truth and accuracy of such agreements and representations, which are deemed material to the acceptance of the risk or the hazard assumed by the Insurer under the Policy.

**SECTION XVIII – ENTIRE AGREEMENT**

This Policy, together with the Declarations, **application** and endorsements, embodies all agreements existing between the Named Entity and the Insurer or any of their agents relating to this insurance. The headings or captions used in this Policy are for the purposes of reference only and will not otherwise affect the meaning of this Policy.

PROFESSIONAL LIABILITY

**MARKEL°**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**A.** This Policy includes coverage for any **claim** for **wrongful acts** resulting from any **certified act of terrorism**.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the Insurer has met the Insurer's deductible under the Terrorism Risk Insurance Act, the Insurer will not be liable for the payment of any portion of the amount of such **losses** that exceeds $100 billion, and in such case insured **losses** up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.** With respect to coverage provided by this endorsement, the following is added to Section II – Definitions:

**Certified acts of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The following criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any **loss** which would otherwise be excluded under this Policy.

All other terms and conditions remain unchanged.

PROFESSIONAL LIABILITY

**MARKEL®**

## MARKEL AMERICAN INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### DATABREACH℠
### NETWORK AND INFORMATION SECURITY AND MEDIA INJURY LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

A. The following coverages are added to Section I – Coverage, **A.** Insuring Agreements:

**Network And Information Security Coverage**

1. **Network And Information Security Liability**

   The Insurer shall pay on behalf of the **insured**, in excess of the Deductible shown in the Declarations, all sums which the **insured** shall become legally obligated to pay as **damages** and **regulatory fines** both of which are a result of a **claim** first made against the **insured** during the Policy Period or the Extended Reporting Period, if applicable, and reported to the Insurer pursuant to Paragraph **E.** by reason of an **unauthorized access, potential unauthorized access, funds transfer fraud incident, social engineering incident, unintentional data compromise**, or **regulatory proceeding**; provided the **unauthorized access, funds transfer fraud incident, social engineering incident, unintentional data compromise**, or **regulatory proceeding** or the discovery of the **potential unauthorized access** happens:

   a. Happens during the Policy Period or on or after the Retroactive Date shown in the Declarations; and

   b. Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the **control group** had any knowledge of such **unauthorized access, potential unauthorized access, funds transfer fraud incident, social engineering incident, unintentional data compromise**, or **regulatory proceeding**.

2. **Media Injury Liability**

   The Insurer shall pay on behalf of the **insured**, in excess of the Deductible shown in the Declarations, all sums which the **insured** shall become legally obligated to pay as **damages** which are a result of a **claim** first made against the **insured** during the Policy Period or the Extended Reporting Period, if applicable, and reported to the Insurer pursuant to Paragraph **E.** by reason of a **media injury**; provided the **media injury**:

   a. Happens during the Policy Period or on or after the Retroactive Date shown in the Declarations; and

   b. Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the **control group** had any knowledge of such **media injury**.

3. **Network Security Loss**

   a. The Insurer shall indemnify the Named Entity for the amount of **loss** which is in excess of the Deductible shown in the Declarations and which results directly from an **unauthorized access** or **potential unauthorized access** which occurs during the Policy Period or on or after the Retroactive Date shown in the Declarations; is reported to the Insurer pursuant to Paragraph **E.**; and prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the **control group** had any knowledge of such **unauthorized access** or **potential unauthorized access**.

Unauthorized access or potential unauthorized access includes any continuation, change or resumption of that unauthorized access or potential unauthorized access after the end of the Policy Period; and

b. The Insurer shall indemnify the Named Entity for the amount of business interruption loss sustained subsequent to the Retention Period shown in the Declarations and which results directly from an unauthorized access or potential unauthorized access which occurs during the Policy Period or on or after the Retroactive Date shown in the Declarations and is reported to the Insurer pursuant to Paragraph E., and prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the control group had any knowledge of such unauthorized access or potential unauthorized access.

Unauthorized access or potential unauthorized access includes any continuation, change or resumption of that unauthorized access or potential unauthorized access after the end of the Policy Period.

All business interruption loss from multiple business interruption events that arise out of the same unauthorized access or out of interrelated unauthorized accesses, shall be deemed to be a single business interruption event; however, a separate Retention Period, as stated in the Declarations, shall apply to each such business interruption event.

4. **Breach Mitigation Expense**

   a. The Insurer shall indemnify the Named Entity for the reasonable costs incurred by the Named Entity with the prior written consent of the Insurer, for breach mitigation expense which results directly from an unintentional data compromise, the entirety of which occurs during the Policy Period or on or after the Retroactive Date shown in the Declarations and is reported to the Insurer pursuant to Paragraph E., provided prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the control group had any knowledge of such unintentional data compromise.

   b. With respect to any amount that the Insurer shall indemnify for costs actually incurred by the Named Entity pursuant to this Insuring Agreement, if similar expenses become part of a judgment, award or settlement subject to coverage under Paragraph A.1. Network And Information Security Liability, such expenses shall not also be subject to reimbursement under this Insuring Agreement.

5. **PCI Assessments**

   The Insurer shall indemnify the Named Entity for the amount of PCI assessments which is in excess of the Deductible shown in the Declarations and which results directly from a payment card breach which occurs during the Policy Period or on or after the Retroactive Date stated in the Declarations; is reported to the Insurer pursuant to Paragraph E.; and prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the control group had any knowledge of such payment card breach. Payment card breach includes any continuation, change or resumption of that payment card breach after the end of the Policy Period.

6. **Funds Transfer Fraud Loss**

   The Insurer shall indemnify the Named Entity for the amount of funds transfer fraud loss which is in excess of the Deductible shown in the Declarations and which results directly from a funds transfer fraud incident which occurs during the Policy Period or on or after the Retroactive Date shown in the Declarations and is reported to the Insurer pursuant to Paragraph E.; prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the control group had any knowledge of such funds transfer fraud incident.

7. **Social Engineering Loss**

   The Insurer shall indemnify the Named Entity for the amount of social engineering loss which is in excess of the Deductible shown in the Declarations and which results directly from a social engineering incident which occurs during the Policy Period or on or after the Retroactive Date shown in the Declarations and is reported to the Insurer pursuant to Paragraph E.; prior to the effective date of the first continuous coverage of this Insuring Agreement with the Insurer, no member of the control group had any knowledge of such social engineering incident.

B. Solely with respect to the coverage provided under this endorsement, Section II – Definitions is amended as follows:

   1. Definitions E. Claim, Y. Loss, CC. Private data, MM. Unauthorized access and NN. Unintentional data compromise are replaced by the following:

E. **Claim** means, with regard to Paragraph **A.1.** Network And Information Security Liability and **2.** Media Injury Liability only, the **insured's** receipt of.

1. A written demand for **damages**;

2. The service of suit or institution of arbitration proceedings against the **insured**; or

3. A notice of a charge against the **insured** by any **authority** or any administrative proceeding initiated by an **authority** including any official investigation, conciliation meeting or formal hearing;

all as a result of an **unauthorized access**, **potential unauthorized access**, **funds transfer fraud incident**, **social engineering incident**, **unintentional data compromise**, **media injury** or **regulatory proceeding**.

Y. **Loss** means·

1. **Forensic expense** and reasonable and necessary costs incurred by the Named Entity to restore with due diligence and dispatch the Named Entity's **electronic communications system** to the condition that existed prior to an **unauthorized access**, including restoration or reinstallation of software applications, **electronic data** and media which form a part of the Named Entity's **electronic communications system**;

2. **Extra expense** incurred by the Named Entity in continuing the conduct of the Named Entity's business during the period from the time of the discovery of an **unauthorized access** to the time the Named Entity's **electronic communications system** is or can be restored with due diligence and dispatch to the condition that existed prior to an **unauthorized access**;

3. Subject to prior approval by the Insurer, expenses necessarily incurred by the Named Entity to reduce **loss** under Paragraph **A.3.** Network Security Loss, after an **unauthorized access** has happened and to the extent that such expenses do not exceed the value of the **loss** which such expenses are incurred to reduce;

4. Loss of money, securities, bonds or similar financial instruments with monetary value which is incurred by the Named Entity and which is proximately caused by the **unauthorized access** committed by a person or group of persons, none of whom are an **insured** or an **employee** of any **insured**, having the intent to commit fraud, theft, or other dishonest act; or

5. Subject to prior written approval by the Insurer, the Named Entity's payment of an extortion demand

However, **loss** shall not include:

a. Any cost or charges associated with building, modifying or upgrading the Named Entity's **electronic communications system**, or any software, security measures or procedures;

b. Any cost required to repair, build or modify tangible property to comply with any award or order by a court, an **authority**, arbitration or any similar proceeding;

c. Any loss of reputation of the Named Entity or loss of customer confidence in the Named Entity or the value imputed to such loss;

d. Expenses incurred by the **insured** in establishing the amount of any **loss** covered under this Policy;

e. **Business interruption loss**;

f. **PCI assessments**;

g. **Funds transfer fraud loss**, or

h. **Social engineering loss**.

CC. **Private data** means data containing:

1. An individual's driver license or other state-issued identification number; social security number; unpublished telephone number; savings account, checking account, credit card or debit card number each when in combination with the security code, access code, password or pin for such account or card number;

2. Nonpublic personal information as defined in the Gramm-Leach-Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

3. Protected healthcare information as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto, and medical and healthcare information;

4. Private personal information as defined under a **security breach notice law**;

5. Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information; or

6. Commercial information subject to provisions of a non-disclosure agreement or a contractual warranty relating to the confidentiality of such information in a written contract in place prior to an **unintentional data compromise**;

not including any lawfully available data accessible by the general public.

**MM. Unauthorized access** means a breach of the Named Entity's **electronic communications system**, including:

1. Any intentional violation, interception, or use or misuse of the Named Entity's **electronic communications system**, whether or not for profit or gain, by any person, without the permission, knowledge or ratification of the **insured**;

2. Access to the Named Entity's **electronic communications system** that is with the **insured's** permission where such permission is the result of fraud or deception, including phishing scams;

3. Use of the Named Entity's **electronic communications system** by a party, including but not limited to a rogue **employee**, authorized by the **insured** to use such system, who does so for an unauthorized purpose;

4. The introduction of programs into the Named Entity's **electronic communications system** which contain fraudulent or destructive instructions or code including any inadvertent transmission of such programs to a third party;

5. A credible threat or an extortion demand, including but not limited to a threat or demand by ransomware, received by the Named Entity threatening or portending loss, injury or damage to:

   a. The Named Entity's **electronic communications system**, including programs, **electronic data** and media which form a part of the Named Entity's **electronic communications system**; or

   b. Money, securities, bonds or similar financial instruments, solely to the extent that record of such is maintained in digital or electronic format on the Named Entity's **electronic communications system**;

   for the purpose of extorting money or other valuable consideration from the Named Entity; or

6. Failure to prevent a denial of service attack on the Named Entity's **electronic communications system** or to prevent the use of the Named Entity's **electronic communications system** by an unauthorized user or code to launch a denial of service attack on a third party.

**NN. Unintentional data compromise** means:

1. Any computer security incident, intrusion, breach, compromise, theft, loss or misuse of the Named Entity's customers' or **employees' private data**;

2. The failure of any third party to prevent the unauthorized viewing, copying or distribution of **private data** which the Named Entity has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the **private data** so entrusted; or

3. Unintentional breach of the Named Entity's written privacy policy.

2. The following definitions are added:

**Authority** means any agency of:

1. A federal, state or local government of the United States of America, its territories or possessions or Puerto Rico;

2. A federal, provincial or local government of the United Kingdom, Canada, and other commonwealth nations; or

3. The government of the European Union (EU) or any member nation;

any of which is charged with the administration or enforcement of laws or regulations relating to the use, transfer or storage of electronic communications or data storage systems.

**Bodily injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these.

**Breach mitigation expense** means expenses incurred with the prior written consent of the Insurer for:

1. The services of a public relations professional, or other publicity expenses that are recommended by a public relations professional to respond to any adverse publicity in the media, that is the result of an **unauthorized access**, **potential unauthorized access**, or **unintentional data compromise**;

2. Expenses, including but not limited to notification and call center costs and related legal fees, that are incurred to comply with a **security breach notice law** and that are the result of an **unauthorized access**, **potential unauthorized access**, or **unintentional data compromise**;

3. Expenses associated with voluntarily providing notifications, credit monitoring services, identity restoration services, or credit repair services to individuals affected by an **unauthorized access**, **potential unauthorized access**, or **unintentional data compromise**;

4. Expenses associated with the Named Entity's contractual obligation to indemnify its customer, a merchant bank or a payment card processor for amounts as included in Paragraphs **1.**, **2.**, and **3.** above arising from an **unintentional data compromise**, but only if such obligation was present in a written service agreement effected by the parties prior to the **unintentional data compromise**; or

5. Expenses associated with the services of a data security expert breach coach or consultant that are incurred in response to an **unauthorized access**, **potential unauthorized access** or **unintentional data compromise**;

however, **breach mitigation expense** shall not include **PCI assessments**

**Business income** means:

1. The net profit or loss before income taxes that the Named Entity would have earned or incurred per hour during a **business interruption event**, based on the average, hourly gross profit or loss the Named Entity has generated in the 12 months prior to inception of the **business interruption loss**; added to

2. The Named Entity's fixed operating expenses, including payroll, incurred per hour during a **business interruption event**, but only to the extent that such operating expenses must necessarily continue during the **business interruption event** and such expenses would have been incurred by the Named Entity had such **business interruption event** not occurred. For manufacturing risks, net income includes the net sales value of production.

**Business interruption event** means the actual and necessary interruption to or degradation in the availability of the Named Entity's **electronic communications system** resulting in a **business interruption loss**.

**Business interruption event** shall not include any business interruption due to or caused by any cause other than an **unauthorized access**, including but not limited to:

1. Any cause of loss causing physical damage to real or personal property owned, rented, leased or occupied by, or in the care, custody or control of the Named Entity;

2. Any failure or interruption of service attributable to an Internet service provider, telecommunications provider, utility provider or other infrastructure provider; or

3. Loss of power, heating, cooling or other utilities.

Any **business interruption event** will be deemed to end and the Insurer's reimbursement related to such **business interruption event** will stop at the hour either:

a. The interruption to or degradation in the availability of the Named Entity's **electronic communications system** ceases; or

b. The **business interruption loss** ceases;

whichever occurs first.

**Business interruption loss** means **business income** which is reduced by at least 25%; and such reduction in **business income**:

1. Lasts in excess of the Retention Period stated in the Declarations, and

2. Is a direct result of an **unauthorized access**.

**Business interruption loss** shall not include·

a. **Loss, funds transfer fraud loss or social engineering loss,**

b. Reduction in revenue incurred as a result of unfavorable business conditions,

c. Reduction in revenue due to loss of market share or any other consequential loss; or

d. Costs or expenses incurred by the Named Entity to identify and remove software program errors or vulnerabilities

**Claim expenses** means reasonable and necessary amounts incurred by the Insurer, or by the **insured** with the prior written consent of the Insurer, in the defense of that portion of any **claim** or **regulatory proceeding** for which coverage is afforded under this Policy, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Insurer to apply for or furnish any such bonds, and costs of appeals; however, **claim expenses** shall not include·

1. Salary, wages, overhead, or benefit expenses of or associated with **employees** or officials of the Named Entity or employees or officials of the Insurer, or

2. Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or outside counsel for the Named Entity or the Insurer

**Control group** means board members, CEO, COO, CIO, CFO, CTO, in-house counsel, Human Resources Director, Risk Manager or the functional equivalents of the Named Entity.

**Damages** means the monetary portion of any judgment, award or settlement, including punitive or exemplary damages where insurable by law; however, **damages** shall not include.

1. Multiplied portions of damages in excess of actual damages, including trebling of damages,

2. The cost of any modifications or changes to the **insured's** security measures, procedures, software or hardware required or agreed to by the **insured** to satisfy a judgment, award or settlement,

3. Any cost required to repair, build or modify property to comply with any award by a court, administrative order, arbitration award or any similar judgment,

4. Taxes, criminal or civil fines, or attorneys' fees of a party other than an **insured**, and other penalties imposed by law;

5. Sanctions;

6. Matters which are uninsurable under the law pursuant to which this Policy shall be construed;

7. The return, withdrawal, reduction or restitution or payment of any fees, profits or charges for services or consideration or any expenses paid to the **insured**,

8. **Regulatory fines**, or

9. **PCI assessments**

**Employee** means any natural person (except a director or trustee of the Named Entity, if the Named Entity is a corporation or trust, who is not also an officer or employee thereof) while in the regular service of the Named Entity in the ordinary course of the Named Entity's business and whom the Named Entity compensates by salary, wages or commissions and has the right to govern and direct the performance of such service **Employee** includes any **leased worker** and any **temporary worker**, but does not include any independent contractor or consultant of the Named Entity.

**Extra expense** means necessary expenses that the Named Entity would not have incurred if there had not been a **loss** resulting from an **unauthorized access**.

**Forensic expense** means reasonable and necessary costs incurred by the Named Entity to engage the services of a third party computer security expert to determine the existence and cause of any **unauthorized access**

**Funds transfer fraud incident** means any priming, pre-texting, spoofing, or other fraudulent or deceptive communication sent to an **insured** within normal course of Named Entity's business operations resulting in **funds**

MPL 1220 07 17                                                                                                    Page 6 of 14

**transfer fraud loss. Funds transfer fraud incident** shall not mean **unauthorized access** or **social engineering incident**

**Funds transfer fraud loss** means the loss of money, securities, bonds or similar financial instruments with monetary value which is incurred by the Named Entity and which is directly caused by a fraudulent or deceptive communication

**Interrelated unauthorized access** means **unauthorized access** or **potential unauthorized access** that have as a common connection or nexus of any fact, incident, circumstance, situation, or any computer security incident, intrusion, breach, compromise, theft, loss or use of the Named Entity's **electronic communications system.**

**Leased worker** means a person leased to the Named Entity by a labor leasing organization, under an agreement between the Named Entity and the labor leasing organization, to perform duties related to the conduct of the Named Entity's business and which duties are at the Named Entity's direction

**Media injury** means injury arising from any of the following:

1. Libel, slander or defamation or any other form of disparagement;
2. Invasion or infringement of the right of privacy or the right of publicity;
3. Infringement of copyright, service name or trademark, title, trade dress, trade name or slogan and unfair competition alleged in connection therewith;
4. Plagiarism, piracy or misappropriation of ideas under implied contract; or
5. Infliction of emotional distress, mental anguish, false arrest or malicious prosecution

**Payment card breach** means an actual or suspected unintentional disclosure of payment card data stored or processed by the Named Entity or an **unauthorized access**

**PCI assessments** means amounts assessed against the Named Entity by any payment card company:

1. To recover actual costs incurred by a payment card company, issuing bank or acquiring bank to replace credit cards or debit cards, the numbers of which have been compromised by a **payment card breach;**
2. To refund fraudulent charges which resulted from a **payment card breach** whether incurred by a cardholder, an issuing bank or an acquiring bank or to pay costs assessed by the PCI as audit costs, or
3. Any fines or penalties or amounts voluntarily agreed to by the Named Entity for an actual or alleged violation of the Payment Card Industry Data Security Standard.

However, **PCI assessments** shall not include **breach mitigation expense.**

**Policy event** means **unauthorized access, potential unauthorized access, regulatory proceeding, media injury, unintentional data compromise, payment card breach, funds transfer fraud incident** or **social engineering incident.**

**Policy payment** means **damages, regulatory fines, claim expenses, loss, business interruption loss, breach mitigation expense, PCI assessments, funds transfer fraud loss** or **social engineering loss.**

**Potential unauthorized access** means the threat or potential threat of an **unauthorized access** to the Named Entity's **electronic communications system.** However, **potential unauthorized access** shall not mean **funds transfer fraud incident** or **social engineering incident**

**Property damage** means physical injury to tangible property, including all resulting loss of use of that property or loss of use of tangible property that is not physically injured other than covered **funds transfer fraud loss** or **social engineering loss;** however, damage to, corruption of or inability to access data, software and computer networks shall not be considered to be loss of use of tangible property.

**Regulatory fines** means civil fines and penalties assessed against the **insured** by an **authority** as a result of a **regulatory proceeding** under Paragraph **A.1.** Network And Information Security Liability.

**Regulatory proceeding** means a formal hearing, official investigation, examination, inquiry, legal action or any other similar proceeding initiated by an **authority** against the Named Entity

**Security breach notice law** means any law, statute or regulation within the United States of America, its territories or possessions, Puerto Rico or Canada requiring the Named Entity to notify individuals of the compromise or possible compromise of the security of their confidential information in the Named Entity's care,

custody or control, the European Union (EU) Data Protection Act of 1995, and the General Data Protection Regulation.

**Social engineering incident** means any priming, pre-texting, spoofing, or other fraudulent, manipulative or deceptive communication sent to an **insured** within the normal course of the Named Entity's business operations resulting in **social engineering loss Social engineering incident** shall not mean **unauthorized access** or **funds transfer fraud incident.**

**Social engineering loss** means:

1. The actual cost of loss of tangible property with pecuniary value which is incurred by the Named Entity;

2. Theft or misdirection of funds held in escrow or trust; or

3. Theft of personal funds of members of the **control group;**

which is directly caused by a fraudulent or deceptive communication.

**Temporary worker** means any person who is furnished to the Named Entity to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload requirements

C. Solely with respect to the coverage provided under this endorsement, Section III – Exclusions is amended as follows

1. The lead-in sentence is replaced with the following:

   This Policy does not apply to any **policy event** or **policy payment**

2. The following exclusions are added:

   This Policy does not apply to any **policy event** or **policy payment:**

   a. Based upon or arising out of liability of others assumed by the **insured** under any contract or agreement; however, this exclusion shall not apply to liability an **insured** would have in the absence of such contract or agreement, or to any contractual obligation in a written service agreement effected by the parties prior to the **unauthorized access, unintentional data compromise,** or **payment card breach** assumed by the Named Entity to indemnify its customer, a merchant bank or a payment card processor for **breach mitigation expenses, PCI assessments,** or **damages** arising from an **unauthorized access, unintentional data compromise,** or **payment card breach;**

   b. Caused by access to the Named Entity's **electronic communications system** attributed by the government of the United States of America to any government, governmental agency or sub-agency, or any agents thereof while acting on behalf of such entity;

   c. Due to riot, civil commotion, war, insurrection or usurped power,

   d. For **bodily injury**; however, this exclusion shall not apply to **damages** resulting from humiliation or the infliction of emotional distress arising solely from an **unauthorized access, potential unauthorized access, funds transfer fraud incident, social engineering incident** or **media injury;**

   e. For **property damage**; however, this exclusion shall not apply to damage to, corruption of or inability to access data, software and computer networks arising solely from an **unauthorized access, potential unauthorized access, funds transfer fraud incident** or **media injury,**

   f. Based upon, arising out of, or in any way involving any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities. antitrust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships; however, this exclusion shall not apply to a **regulatory proceeding** resulting directly from an **unauthorized access, unintentional data compromise,** or **media injury;**

   g. Based upon, arising out of, or in any way involving conduct of the **insured** or at the **insured's** direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any statute or regulation; however, this exclusion shall not apply to

      (1) The strictly vicarious liability of any **insured** for the intentional, willful, dishonest or fraudulent conduct of another **insured** or for the conduct of another **insured** that constitutes a willful violation of any statute or regulation, or

      (2) **Claim expenses** incurred until an allegation is determined through admission by the **insured** or final adjudication to be intentional, willful, dishonest or fraudulent or a willful violation of any statute or regulation;

h. Brought by or on behalf of any **employee**, former **employee** or prospective **employee** based upon, arising out of, or in any way involving the employment relationship or the nature, terms or conditions of employment or any workplace tort;

i. Brought by, in the name of, or on behalf of any **insured**; however, this exclusion shall not apply to any **claim** arising out of **unintentional data compromise** of the personal information of an **employee** which is in the care, custody or control of the Named Entity;

j. Based upon, arising out of, or in any way involving the insolvency, receivership, bankruptcy, liquidation of the Named Entity or of any subsidiary;

k. Based upon or arising out of any warranties or guarantees, express, implied or otherwise, or any cost estimates; however, this exclusion shall not apply to any liability that the Named Entity would have in the absence of such warranty or guarantee;

l. Based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds or property; however, this exclusion shall not apply to **loss**, **funds transfer fraud loss** or **social engineering loss**;

m. Based upon or arising out of any inability or failure of any party to pay or collect monies; however, this exclusion shall not apply to inability or failure to pay or collect monies resulting directly from **unauthorized access**, **funds transfer fraud incident**, or **social engineering incident**;

n. Based upon or arising out of infringement or inducement of infringement of patent or trade secret; or

o. Based upon or arising out of an act, error or omission in the performance of professional services rendered or that should have been rendered by the **insured** or by any person or organization for whose acts, errors or omissions the **insured** is legally responsible.

Solely with respect to Paragraph **A.1.** Network And Information Security Liability and **2.** Media Injury Liability, this Policy does not apply to any **claim**:

a. Made by any person or organization which is operated, managed or owned, in whole or in part, by the Named Entity or any parent organization, subsidiary, division or affiliated organization thereof; or

b. Brought by, in the name of, or on behalf of any performance rights organization, including but not limited to ASCAP, BMI, SESAC, SOCAN or SoundExchange,

c. Based upon or arising out of infringement of copyright, title, trade dress, slogan, service mark, service name or trademark, trade name or other intellectual property arising from any tangible goods, service offerings or other products displayed on the Named Entity's web site;

d. Based upon or arising out of contractual liability involving the ownership of intellectual property with any vendor, customer, sub-contractor, current or former **employee**;

e. Based upon or arising out of failure of goods, products or services to conform to any statement of quality or performance;

f. Based upon or arising out of any description relating to the price of goods, products or services; or

g. Based upon or arising out of entries posted on blogs, bulletins boards, chat rooms or other internet forums not directly controlled by the Named Entity with or without the knowledge of the Named Entity.

Solely with respect to Paragraph **A.3.** Network Security Loss, this Policy does not apply to any **loss** or **business interruption loss**:

a. Caused by theft, physical damage, destruction or failure of the Named Entity's **electronic communications system** or any part thereof; however, this exclusion shall not apply to theft, physical damage, destruction or failure of programs, **electronic data** and media caused by an **unauthorized access**;

b. Based upon or arising out of **media injury**;

c. Based upon or arising out of theft, or alleged theft, of money, securities, bonds, or similar financial instruments with monetary value caused or contributed to by any fraudulent, dishonest or criminal act committed by any person who is an **employee** or an **insured** at the time of the **unauthorized access**, whether acting alone or in collusion with others; or

d. Of the value of trade secrets, confidential processing methods or other confidential or proprietary information.

Solely with respect to Paragraph **A.6.** Funds Transfer Fraud Loss, this Policy does not apply to any **funds transfer fraud loss** based upon, arising out of or in any way involving any **funds transfer fraud loss** caused by an **insured** with fraudulent or dishonest intent.

Solely with respect to Paragraph **A.7.** Social Engineering Loss, this Policy does not apply to any **social engineering loss** based upon, arising out of or in any way involving any **social engineering loss** caused by an **insured** with fraudulent or dishonest intent.

D. Solely with respect to coverage provided by this endorsement, Section **IV** – Limits Of Liability And Retentions is replaced with the following:

### SECTION IV – LIMITS OF LIABILITY AND RETENTIONS

#### A. Limits Of Liability

1. **Network And Information Security Liability**

   a. Each Claim

      (1) The liability of the Insurer under Paragraph **A.1.** Network And Information Security Liability for the combined total of **damages** and **claim expenses** for each **claim** first made against the **insured** during the Policy Period or Extended Reporting Period, if applicable, and reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the Network And Information Security Liability Each Claim Limit Of Liability shown in the Declarations.

      (2) The liability of the Insurer under Paragraph **A.1.** Network And Information Security Liability for the combined total of **regulatory fines** for each **claim** first made against the **insured** during the Policy Period or Extended Reporting Period, if applicable, and reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the Regulatory Fines Each Claim Limit Of Liability shown in the Declarations.

   b. Network And Information Security Aggregate

      (1) The total liability of the Insurer under Paragraph **A.1.** Network And Information Security Liability shall not exceed the Network And Information Security Liability Aggregate Limit Of Liability shown in the Declarations for all **damages and claim expenses** arising out of all **claims** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable.

      (2) The total liability of the Insurer under Paragraph **A.1.** Network And Information Security Liability shall not exceed the Regulatory Fines Aggregate Limit Of Liability shown in the Declarations for all **regulatory fines** arising out of all **claims** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable.

2. **Media Injury**

   a. Each Claim

      The liability of the Insurer under Paragraph **A.2.** Media Injury Liability for the combined total of **damages** and **claim expenses** for each **claim** first made against the **insured** during the Policy Period or Extended Reporting Period, if applicable, and reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the Media Injury Liability Each Claim Limit Of Liability shown in the Declarations.

   b. Media Injury Aggregate

      The total liability of the Insurer under Paragraph **A.2.** Media Injury Liability shall not exceed the Media Injury Liability Aggregate Limit Of Liability shown in the Declarations for all **damages**, and **claim expenses** arising out of all **claims** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable.

3. **Network Security Loss**

   a. Each Unauthorized Access

      The liability of the Insurer under Paragraph **A.3.** Network Security Loss for all **loss** resulting directly from each **unauthorized access** reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the Network Security Loss Each Unauthorized Access Limit Of Liability shown in the Declarations.

   b. Each Business Interruption Event

      The liability of the Insurer under Paragraph **A.3.** Network Security Loss for all **business interruption loss** resulting directly from each **business interruption event** reported to the Insurer pursuant to Paragraph

E., shall not exceed the applicable Network Security Business Interruption Loss Each Business Interruption Event Limit Of Liability shown in the Declarations.

c. Network Security Aggregate

    **(1)** The total liability of the Insurer under Paragraph **A.3.** Network Security Loss shall not exceed the Network Security Loss Aggregate Limit Of Liability shown in the Declarations for all **loss** incurred by the Named Entity which results directly from all **unauthorized accesses** reported to the Insurer pursuant to Paragraph **E.**

    **(2)** The total liability of the Insurer under Paragraph **A.3.** Network Security Loss shall not exceed the Network Security Business Interruption Loss Aggregate Limit Of Liability shown in the Declarations for all **business interruption loss** incurred by the Named Entity which results directly from all **business interruption events** reported to the Insurer pursuant to Paragraph **E.**

**4.  Breach Mitigation Expense**

a. Each Unintentional Data Compromise

    The liability of the Insurer under Paragraph **A.4.** Breach Mitigation Expense for **breach mitigation expense** from each **unintentional data compromise** reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the Breach Mitigation Expense Each Unintentional Data Compromise Limit Of Liability shown in the Declarations.

b. Breach Mitigation Aggregate

    The total liability of the Insurer under Paragraph **A.4.** Breach Mitigation Expense shall not exceed the Breach Mitigation Expense Aggregate Limit Of Liability shown in the Declarations for all **breach mitigation expense** reported to the Insurer pursuant to Paragraph E., from all **unintentional data compromise**.

**5.  PCI Assessments**

a. Each Payment Card Breach

    The liability of the Insurer under Paragraph **A.5.** PCI Assessments for all **PCI assessments** resulting directly from each **payment card breach** which is reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the PCI Assessments Each Payment Card Breach Limit Of Liability shown in the Declarations.

b. PCI Assessments Aggregate

    The total liability of the Insurer under Paragraph **A.5.** PCI Assessments shall not exceed the PCI Assessments Aggregate Limit Of Liability shown in the Declarations for all **PCI assessments** incurred by the Named Entity which results directly from **payment card breach** reported to the Insurer pursuant to Paragraph **E.**

**6.  Funds Transfer Fraud Loss**

a. Each Funds Transfer Fraud Incident

    The liability of the Insurer under Paragraph **A.6.** Funds Transfer Fraud Loss for all **funds transfer fraud loss** resulting directly from each **funds transfer fraud incident** which is reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the Funds Transfer Fraud Each Funds Transfer Fraud Incident Limit Of Liability shown in the Declarations.

b. Funds Transfer Fraud Loss Aggregate

    The total liability of the Insurer under Paragraph **A.6.** Funds Transfer Fraud Loss shall not exceed the Funds Transfer Fraud Loss Aggregate Limit Of Liability shown in the Declarations for all **funds transfer fraud loss** incurred by the Named Entity which results directly from **funds transfer fraud incidents** reported to the Insurer pursuant to Paragraph **E.**

**7.  Social Engineering Loss**

a. Each Social Engineering Incident

    The liability of the Insurer under Paragraph **A.7.** Social Engineering Loss for all **social engineering loss** resulting directly from each **social engineering incident** which is reported to the Insurer pursuant to Paragraph **E.**, shall not exceed the Social Engineering Each Social Engineering Incident Limit Of Liability shown in the Declarations.

    **b.** Social Engineering Loss Aggregate

      The total liability of the Insurer under Paragraph **A.7.** Social Engineering Loss shall not exceed the Social Engineering Loss Aggregate Limit Of Liability shown in the Declarations for all **social engineering loss** incurred by the Named Entity which results directly from **social engineering incidents** reported to the Insurer pursuant to Paragraph **E.**

**8.  Combined Network And Information Security And Media Injury Liability Aggregate Limit Of Liability**

    The Combined Network And Information Security And Media Injury Liability Aggregate Coverage Limit Of Liability shown in the Declarations shall be the Insurer's maximum aggregate liability for the combined total of all **policy payments** under all purchased Insuring Agreements, combined. This limit shall be part of and not in addition to the Policy Aggregate Limit Of Liability shown in the Declarations.

**B.  Deductible**

  **1.** With regard to Paragraph **A.1.** Network And Information Security Liability:

    **a.** The Network And Information Security Liability Each Claim Deductible shown in the Declarations shall be paid by the Named Entity and shall be applicable to each **claim** and shall apply to **damages** and **claim expenses**, whether or not any **damages** payments are made. Such Deductible amounts shall, upon written demand by the Insurer, be paid by the Named Entity within 10 days. The determination of the Insurer as to the reasonableness of the **claim expenses** shall be conclusive on the Named Entity.

    **b.** The Regulatory Fines Each Claim Deductible shown in the Declarations shall be paid by the Named Entity and shall be applicable to each **claim** and shall apply to **damages** and **claim expenses**, whether or not any **damages** payments are made  Such Deductible amounts shall, upon written demand by the Insurer, be paid by the Named Entity within 10 days. The determination of the Insurer as to the reasonableness of the **claim expenses** shall be conclusive on the Named Entity.

  **2.** With regard to Paragraph **A.2.** Media Injury Liability, the Media Injury Liability Each Claim Deductible shown in the Declarations shall be paid by the Named Entity and shall be applicable to each **claim** and shall apply to **damages** and **claim expenses**, whether or not any **damages** payments are made. Such Deductible amounts shall, upon written demand by the Insurer, be paid by the Named Entity within 10 days. The determination of the Insurer as to the reasonableness of the **claim expenses** shall be conclusive on the Named Entity

  **3.** With regard to Paragraph **A.3.** Network Security Loss:

    **a.** The Network Security Loss Each Unauthorized Access Deductible shown in the Declarations shall be applicable to **loss** from each **unauthorized access** or **potential unauthorized access**. Such Deductible amount will be deducted from the amount of **loss** for which the Insurer shall indemnify the Named Entity; and

    **b.** The Retention Period For Each Business Interruption Event shown in the Declarations shall be applicable to **business interruption loss** from each **business interruption event**. Such Retention Period shall reduce the number of hours of **business interruption loss** for which the Insurer shall reimburse the Named Entity.

  **4.** With regard to Paragraph **A.4.** Breach Mitigation Expense, the Breach Mitigation Expense Each Unintentional Data Compromise Deductible shown in the Declarations shall be applicable to **breach mitigation expense** from each **unintentional data compromise**. Such Deductible amount will be deducted from the amount of **breach mitigation expense** for which the Insurer shall reimburse the Named Entity. Such Deductible will not apply to amounts incurred for services of a breach coach as set forth in Paragraph **5.** of the definition of **breach mitigation expense**.

  **5.** With regard to Paragraph **A.5.** PCI Assessments, the PCI Assessments Each Payment Card Breach Deductible shown in the Declarations shall be applicable to **PCI assessments** from each **payment card breach**. Such Deductible amount will be deducted from the amount of **PCI assessments** for which the Insurer shall indemnify the Named Entity.

  **6.** With regard to Paragraph **A.6.** Funds Transfer Fraud Loss, the Funds Transfer Fraud Loss Each Funds Transfer Fraud Incident Deductible shown in the Declarations shall be applicable to **funds transfer fraud loss** from each **funds transfer fraud incident**. Such Deductible amount will be deducted from the amount of **funds transfer fraud loss** for which the Insurer shall reimburse the Named Entity.

  **7.** With regard to Paragraph **A.7.** Social Engineering Loss, the Social Engineering Loss Each Social Engineering Incident Deductible shown in the Declarations shall be applicable to **social engineering loss** from each

social engineering incident Such Deductible amount will be deducted from the amount of social engineering loss for which the Insurer shall reimburse the Named Entity.

## C. Multiple Insureds, Claims, Claimants, Policy Events And Policy Payments

1. The inclusion herein of more than one insured in any claim or policy event or the reporting of a policy payment incurred by more than one person or organization or under more than one purchased Insuring Agreement of this Policy, shall not operate to increase the Limits Of Liability stated in the Declarations and the Policy

2. More than one policy payment arising out of a single claim or policy event shall be treated as a single claim or policy event and shall be deemed first made on the date within the Policy Period on which such notice of potential claim or policy event is first received by the Insurer.

3. It is the intent of the Insurer that the coverage afforded under the Insuring Agreements be mutually exclusive. If however, it is determined that more than one purchased Insuring Agreement applies to one policy event ensuing from common nexus of fact, circumstance, situation, event, transaction, or cause then the smallest of the applicable Deductibles for the applicable purchased Insuring Agreements will apply.

E. Solely with respect to coverage provided under this endorsement, Section VI – Notice is replaced with the following.

### SECTION VI – NOTICE

#### A. Reporting Provision

It is a condition precedent to coverage afforded by this Policy that the insured shall give to the Insurer written notice of any policy event, as soon as practicable and in no event later than 60 days after the end of the Policy Period or the Extended Reporting Period, if applicable.

In the event a suit is brought against the insured or a charge against the insured is instituted by any authority or any administrative action is initiated by an authority, the insured shall immediately forward to the address shown in the Claim Reporting Policyholder Notice every demand, notice, summons or other process received by their representatives.

#### B. Discovery Clause

1. Under Paragraph A., 1. Network And Information Security Liability and 2. Media Injury Liability, if during the Policy Period, the insured first becomes aware of a specific policy event which is reasonably expected to result in a claim within the scope of coverage of this Policy then the insured may provide written notice to the Insurer containing the information listed below. If such written notice is received by the Insurer during the Policy Period, then any claim subsequently made against the insured arising out of such policy event shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Insurer.

2. It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Insurer containing the following information.

   a. The description of the specific policy event;

   b. The date on which such policy event took place;

   c. The injury or damage which has or may result from such policy event;

   d. The identity of any injured persons or organization subject to such injury or damage; and

   e. The circumstances by which the insured first became aware of such policy event

   If during the Policy Period the insured provides such written notice of a specific policy event which is reasonably expected to result in a claim within the scope of coverage of this Policy, the Insurer at its sole option, may investigate such specific policy event. Such matter shall be subject to all terms, conditions and provisions in this Policy as applicable to a policy payment.

#### C. Assistance And Cooperation Of The Insured

The insured shall cooperate with the Insurer and upon the Insurer's request, the insured shall:

1. Submit to examination and interview by a representative of the Insurer and while not in the presence of any other insured, under oath if required;

2. Attend hearings, depositions and trials,

3. Assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits, and

4. Give a written statement or statements to the Insurer's representatives and meet with such representatives for the purpose of determining coverage or defending any **claim**, all without cost to the Insurer. The **insured** shall further cooperate with the Insurer and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the **insured** may have.

The **insured** shall not, with respect to any **claim** covered under this Policy, except at their own cost, make any payment, admit any liability, settle any **claims**, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur **claim expenses** without the Insurer's prior written consent, such consent not to be unreasonably withheld. Any costs and expenses incurred by the **insured** prior to the **insured** giving written notice of the **claim** to the Insurer shall be borne by the **insured** and will not constitute satisfaction of the Deductible.

D. **False Or Fraudulent Claims**

If any **insured** shall commit fraud in proffering any information related to coverage under this Policy, this insurance shall become void as to such **insured** from the date such fraud was committed.

F. The following is added to Section VII – Defense Costs, Settlement And Cooperation:

The Insurer may, at its sole discretion, investigate any **policy event**. The Insurer will pay for covered **policy payments** incurred by the Named Entity in excess of the Deductible, if applicable. The Insurer will indemnify the Named Entity within 60 days after receipt of the sworn Proof of Loss of **breach mitigation expenses**, provided·

a. The **Insured** has complied with all the terms of this Policy; and

b. The Insurer and the Named Entity have agreed with the items included within and the amounts documented in the Named Entity's sworn Proof of Loss of **breach mitigation expenses**.

G. Solely with respect to coverage provided under this endorsement, Paragraph A. of Section VIII – Extended Reporting Period is replaced with the following:

If the Named Entity nonrenews or cancels this Policy or if the Insurer nonrenews or cancels this Policy pursuant to Section IX – Cancellation, for reasons other than nonpayment of premium, Deductible, Retention or non-compliance with the terms and conditions of this Policy, then the Named Entity shall have the right upon payment of an additional premium, as stated in the Declarations, to extend the coverage granted in this Policy for the period of months stated in the Declarations, as elected by the Named Entity, to apply to **claims** first made against the **insured** or **policy payments** incurred during the period of months as elected, and reported to the Insurer pursuant to Paragraph **E.**, following immediately upon the effective date of such cancellation or nonrenewal, by reason of any **policy event**, which happened during the Policy Period or on or after the Retroactive Date shown in the Declarations and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Policy. This extended period of coverage as elected by the Named Entity and described in this paragraph shall be referred to in this Policy as the Extended Reporting Period.

If, however, this Policy is immediately succeeded by similar claims made insurance coverage on which the applicable Retroactive Date is the same as or earlier than that shown in the Declarations, as applicable, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Entity shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium, Deductible, Retention or Limit Of Liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

H. The following condition is added to the Policy

**Mitigation**

It is a condition precedent to coverage that the **insured** shall not willfully fail to comply with any **security breach notice law** that the Named Entity may be subject to, by reason of an **unauthorized access**, **potential unauthorized access**, or **unintentional data compromise**.

All other terms and conditions remain unchanged



**PROFESSIONAL LIABILITY**
POLICY NUMBER: FP83837C

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIFE PRODUCT SALES COVERAGE – NAMED INDIVIDUALS

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY COVERAGE FORM

### SCHEDULE

| Named Individuals | Pending And Prior Proceeding Date For Purchase Or Sale Of Insurance As A Life Insurance Agent | Pending And Prior Proceeding Date For Registered Investment Adviser Services | Termination Date |
|---|---|---|---|
| Lillian M Meyers | 12/31/2015 | 01/01/2017 | |
| | | | |
| | | | |
| | | | |

**A.** Each of the Named Individuals shown in the Schedule of this endorsement is a covered **insured** and subject to the exclusion in Paragraph **B.** of this endorsement.

**B.** Section III – Exclusions is amended by the following:

    1. The following exclusion is added:

        This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

        The purchase or sale of **securities** or investments as a **registered representative** or insurance products as a **life insurance agent**; however, this exclusion will not apply to the Named Individuals shown in the Schedule of this endorsement, solely with respect to **wrongful acts** in the rendering of or failure to render **professional services**:

        1. Directly involved in the purchase or sale of insurance products as a **life insurance agent**, provided a Pending And Prior Proceeding Date For Purchase Or Sale Of Insurance As A Life Insurance Agent is shown in the Schedule of this endorsement; or

        2. As a **registered investment adviser** only when rendered on behalf of or under contract with the Named Entity and provided a Pending And Prior Proceeding Date For Registered Investment Adviser Services is shown in the Schedule of this endorsement;

        and occurring on or after the applicable Pending And Prior Proceeding Date and prior to the applicable Termination Date, if any, shown in the Schedule of this endorsement.

    2. With respect to coverage provided by this endorsement, exclusion **J.2.** does not apply.

**MPL 1224 07 17**                                                     **Page 1 of 2**

**C.** Solely with respect to **wrongful acts** in the rendering of or failure to render **professional services** by the Named Individuals included in Paragraph **A.** above, the Pending And Prior Proceeding Date shown in the Declarations is amended to be the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement.

However, if the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement for any Named Individual precedes the Pending And Prior Proceeding Date shown in the Declarations, in the event of a **claim** alleging a **wrongful act**:

1. Arising from the rendering of or failure to render **professional services** by the Named Individual directly involved in the purchase or sale of insurance products as a **life insurance agent**, or as a **registered investment adviser** only when rendered on behalf of or under contract with the Named Entity; or

2. By such Named Individual; and

3. Occurring on or after the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement for such **professional services** and prior to the Pending And Prior Proceeding Date shown in the Declarations;

then the Pending And Prior Proceeding Date shown in the Declarations and applicable to the Named Entity will be equal to the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement for such Named Individual for such **professional services**.

**D.** This endorsement will not increase the Limits Of Liability shown in the Declarations.


All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**
POLICY NUMBER. FP83837C

# MARKEL AMERICAN INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SCHEDULE OF PROFESSIONAL SERVICE PROVIDERS

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**SCHEDULE**

| Individual Or Entity | Services |
|---|---|
| Meyers Financial Services, Inc | Divorce Financial Consultant Rendering services related to a divorce or dissolution of civil union, domestic partnership or same-sex marriage including, but not limited to, advising on and supervising the financial aspects of divorce or dissolution Expert witness testimony as a Divorce Financial Consultant, divorce mediation, collaborative divorce services, expense and income tracings, and financial techniques for the sole purpose of dividing assets or identifying methods for liquidation of client assets including pension valuations. Assisting a licensed attorney to prepare a Qualified Domestic Relations Order, a pre-nuptial agreement or a post-nuptial agreement |

Each Individual Or Entity shown in the Schedule of this endorsement is a covered **professional service provider** for the Services described in the Schedule of this endorsement. Such Services must be **professional services**.

All other terms and conditions remain unchanged.

**MPL 1231 07 17**                                                                                   **Page 1 of 1**

PROFESSIONAL LIABILITY
POLICY NUMBER: FP83837C

**MARKEL®**

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SUPPLEMENTAL COVERAGE EXTENSION

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

### SCHEDULE

| Coverage | Limits Of Liability |
|---|---|
| Emergency Real Estate Consulting Fees: | $ 25,000 |
| Key Individual Replacement Expenses: | $ 25,000 |
| Kidnap Expenses: | $ 25,000 |
| Workplace Violence Counseling: | $ 25,000 |

With respect to coverages provided by this endorsement, the following changes apply.

A. The following are added to Section I – Coverage:

#### Emergency Real Estate Consulting Fees

The Insurer will reimburse the Named Entity any reasonable realtor's fees, commissions, or real estate consultant's fee necessitated by the Named Entity's need to relocate due to the **unforeseeable destruction** of the Named Entity's principal location listed in the Declarations during the Policy Period. The Emergency Real Estate Consulting Fee limit shown in the Schedule of this endorsement is the most the Insurer will reimburse per Policy Period for all Named Entities combined.

#### Key Individual Replacement Expenses

The Insurer will reimburse the Named Entity for reasonable **key individual replacement expenses** if a **professional employee** suffers an **injury** during the Policy Period which results in the loss of their life during the Policy Period. The Key Individual Replacement Expenses limit shown in the Schedule of this endorsement is the most the Insurer will pay for all **key individual replacement expenses** in any one Policy Period

#### Kidnap Expenses

The Insurer will pay on behalf of the Named Entity or **professional employee**, reasonable fees incurred as a result of any **professional employee's** kidnapping, or the kidnapping of the **professional employee's spouse**, parent or child during the Policy Period. The Kidnap Expenses limit shown in the Schedule of this endorsement is the most the Insurer will pay for all reasonable fees in any one Policy Period. Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

a. Fees and expenses of an independent negotiator or consultant retained with the Insurer's prior approval,

b. Interest on any loan taken by the Named Entity or **professional employee** to pay damages covered under this policy; provided, however, we shall not be liable for any interest accruing prior to 30 days preceding the date of

MPL 1232 07 17

Page 1 of 3

such payment nor subsequent to the date of reimbursement from the Insurer for any portion of damages recoverable under this policy;

c. Costs of travel and accommodations incurred by the Named Entity or **professional employee** which become necessary due to the applicable kidnapping;

d. The reward paid by the Named Entity or **professional employee** which is pre-approved by the Insurer, to an informant for information not otherwise available which leads to the arrest and conviction of persons responsible for any damages under this policy; and

e. Current salary to the **professional employee** who is kidnapped; provided, however, that such person is held for more than 30 days. Salary shall be paid for a period commencing upon abduction and ceasing upon the earliest of:

   (1) The release of the kidnapped person or discovery of their death;

   (2) 120 days after the Insurer receives the last credible evidence that the kidnapped person is still alive;

   (3) 12 months after the date of kidnapping; or

   (4) Exhaustion of the Kidnap Expenses limit.

**Workplace Violence Counseling**

In the event that an incidence of **workplace violence** occurs at any of the Named Entity's premises during the Policy Period, the Insurer will reimburse the Named Entity for reasonable expenses incurred for the emotional counseling of the Named Entity's **employees** during the Policy Period. The Workplace Violence Counseling limit shown in the Schedule of this endorsement is the most the Insurer will reimburse per Policy Period for all **employees** combined.

B. The following are added to Section II – Definitions:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**Employee(s)** includes leased workers and independent contractors; provided, however, the independent contractor is specifically endorsed by name to this Policy. **Employee** does not include temporary workers.

**Injury** means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt

**Key individual replacement expenses** means the following necessary expenses:

1. Costs of advertising the employment position opening;

2. Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

3. Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up employment contract.

**Professional employee** means a member of the Named Entity's staff, but solely while providing **accounting services, investment advisory services, life and health services,** or **professional services** on behalf of the Named Entity; however, **professional employee** does not include administrative, secretarial, or other clerical support staff, or temporary or leased workers. **Professional employee** does not include independent contractors unless specifically endorsed by name to this Policy.

**Unforeseeable destruction** means damage resulting from a **certified act of terrorism**, fire, crash or collapse which renders all of the Named Entity's primary office completely unusable.

**Workplace violence** means any intentional use or threat of deadly force by any natural person with intent to cause harm and results in **injury**, or death of a natural person while on the Named Entity's premises.

**MPL 1232 07 17**

C. Section **IV** – Limits Of Liability And Retentions is amended by the following.

   1. The following is added to Paragraph **A.** Limits Of Liability:

     The Limits Of Liability shown in the Schedule of this endorsement are in addition to, not part of, the Aggregate Limit Of Liability shown in the Declarations

     Coverages provided by this endorsement are not considered **defense costs**.

   2. The following is added to Paragraph **B.** Retention:

     The Retention does not apply to any coverage provided by this endorsement.

All other terms and conditions remain unchanged.



# MARKEL AMERICAN INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CALIFORNIA AMENDATORY

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

A.  The following is added to Section V – Indemnification:

Bankruptcy or insolvency of any **insured** shall not relieve the Insurer of any of its obligations under this Policy.

B.  Section IX – Cancellation is amended as follows.

1.  Paragraph B. is replaced by the following:

The Insurer may cancel this Policy for non-payment of premium by mailing or delivering to the first Named Entity and to the producer of record, written notice of cancellation, at the address shown in the Declarations, at least 10 days before the effective date of cancellation.

2.  The following is added:

**Nonrenewal**

The Insurer may nonrenew this Policy by mailing or delivering written notice of nonrenewal to the first Named Entity and the producer of record, at the address shown in the Declarations, stating the reason for nonrenewal at least 60 days, but not more than 120 days, before the expiration or anniversary date. A notice of nonrenewal is not required in any of the following situations:

1.  Transfer or renewal of a policy without change between insurers of the same group;

2.  Extensions of 90 days or less;

3.  When the first Named Entity has obtained or agreed to obtain replacement coverage within 60 days of termination;

4.  For 60 day policies, when notice of renewal is given at the time the policy was issued;

5.  When the first Named Entity requests a change in terms, conditions or risks covered by the policy within 60 days prior to end of the policy period; or

6.  When the Insurer has made a written offer 60 days prior to the end of the policy term to renew under different terms.

All other terms and conditions remain unchanged.



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLICY CHANGES

| POLICY NUMBER:<br><br>See Declarations Page | POLICY CHANGES EFFECTIVE:<br><br>See Declarations Page | POLICY CHANGE NUMBER:<br><br>N/A |
|---|---|---|
| NAMED INSURED:<br>See Declarations Page | | PRODUCER NAME AND ADDRESS:<br>See Declarations Page |

THIS ENDORSEMENT MODIFIES INSURANCE UNDER THE FOLLOWING:
INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY
INSURANCE POLICY

The following item(s):

| | | | | |
|---|---|---|---|---|
| ☐ | Named Insured | ☐ | Mailing Address |
| ☐ | Policy Period | ☐ | Insured Legal Status/Business Of Insured |
| ☐ | Retroactive Date | ☐ | Policy Premium |
| ☐ | Effective/Expiration Date | ☐ | Retention |
| ☐ | Payment Plan | ☐ | Endorsements |
| ☐ | Limit(s) Of Liability | ☐ | Rates/Scheduled Rating |
| ☒ | Other: Specify – Specific changes below | | |

is (are) changed to read as shown below:

**A.** Section **III** – Exclusions is amended as follows:

    **1.** Paragraph E. is replaced by the following.

    This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

        **E.** Any **claim** by, or on behalf of, or in the right of (whether such right is transferred or assigned by operation of law or otherwise) any **insured**; provided, however, this exclusion does not apply to any derivative action on behalf of the **insured entity** or any shareholder class action where such action is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **insured**.

    **2.** Paragraph **J.2.** is replaced by the following:

    This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to·

        **J.** Any:

2.  Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had a 5% or more equity interest in the issuer at the time of purchase or sale of such **securities**; or

B.  Paragraph **B.** in Section **VII** – Defense Costs, Settlement And Cooperation is replaced by the following:

    **B.**  No coverage is provided for **claims** against the Named Entity or an **insured entity** in any respect under Insuring Agreement **3.** Directors And Officers Liability Insurance except:

      1.  To the extent of indemnification of **insured executives** by the Named Entity or **insured entity** under Insuring Agreement **3.b.** Directors And Officers Liability Insurance; or

      2.  If Insuring Agreement **3.c** Directors And Officers Liability Insurance is purchased.

All other terms and conditions remain unchanged.

| PREMIUM ADJUSTMENT | | |
|---|---|---|
| ☒  NO CHANGES | ADDITIONAL PREMIUM | RETURN PREMIUM |
| | $ | $ |

Authorized Representative Signature

# EXHIBIT B

<table>
<tr><td>1</td><td>LAW OFFICES OF MIKEL D. BRYAN, P.C.<br>MIKEL D. BRYAN (SBN 84010)</td></tr>
</table>

1  LAW OFFICES OF MIKEL D. BRYAN, P.C.
   MIKEL D. BRYAN (SBN 84010)
2  422 Larkfield Center #322
   Santa Rosa, California 95403
3  (707) 528-1231
   Fax: (707) 528-3143
4
   Attorney for Plaintiff
5

**ENDORSED
FILED**

**MAR 1 4 2019**

**SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA**

6

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                           COUNTY OF SONOMA

10  WILLIAM D. WROBEL, TRUSTEE OF          COMPLAINT FOR BREACH OF
    THE WILLIAM D. WROBEL TRUST            FIDUCIARY DUTIES, BREACH OF
11  dated 10/13/2005                       CONTRACT, FINANCIAL ELDER
                                           ABUSE
12                  Plaintiffs

13      v                                  "Unlimited Civil Case"

14  MEYERS FINANCIAL SERVICES, a           Complaint filed:
    California corporation, individually and   Assigned Judge:
15  doing business as MEYERS FINANCIAL
    SERVICES INC., MEYERS FINANCIAL        SCV-264114
16  SERVICES, and SONOMA VALLEY
    WEALTH MANAGEMENT; LILLIAN M.
17  MEYERS, STEPHANIE
    SHACKELFORD, and Does 1-20,
18  inclusive

19                  Defendants
    _____/
20
          The Plaintiff, William D. Wrobel, Trustee of the William D. Wrobel Trust dated
21
    10/13/2005 ("the Plaintiff") alleges:
22
                           **GENERAL ALLEGATIONS**
23
          1.      The Plaintiff, WILLIAM D. WROBEL (Wrobel") Trustee is, and at all times
24
    herein mentioned was, a resident of the County of Sonoma, State of California, and the named
25
    Trustee of the William D. Wrobel Trust dated 10/13/2005, and over the age of 65 and is
26

27                                  Page 1
28  Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1    statutorily an elder pursuant to California Welfare and Institutions Code Section 15610.27.

2        2.      The defendant, Meyers Financial Services ("MFS"), is and at all times herein

3    mentioned was a California corporation and a registered Investment Advisor in the State of

4    California, providing financial advisory and planning services as MEYERS FINANCIAL

5    SERVICES INC., MEYERS FINANCIAL SERVICES, SONOMA VALLEY WEALTH

6    MANAGEMENT and holding Central Registry Depository No. 136624 as an investment

7    advisory and financial planning service.

8        3.      The defendant, LILLIAN M. MEYERS ("Meyers"), is the sole shareholder,

9    officer and director of the defendant, MFS, individually and/or doing business as MEYERS

10   FINANCIAL SERVICES INC., MEYERS FINANCIAL SERVICES, SONOMA VALLEY

11   WEALTH MANAGEMENT.  MEYERS FINANCIAL SERVICES INC., is not a registered

12   corporation in the State of California and is doing business unlawfully incorporating the word

13   "INC." as part of its business name and the assets and debts of that entity are those of the

14   defendant, Meyers.

15       4.      From December 19, 2017 through October of 2018, the defendant, MFS, acted

16   as investment advisor for the accounts of the Plaintiff, as Client,  under the terms and

17   conditions of that certain written Meyers Financial Services, Inc. INVESTMENT ADVISORY

18   AGREEMENT ("the IAA").  A copy of the IAA is attached hereto as Exhibit 1 and made a part

19   hereof.  Although the written agreement was entered into by an non-existent California

20   corporate entity, i.e., Meyers Financial Services, Inc., the agreement was to control any and all

21   investment advisory and financial planning services provided by MFS or its related entities,

22   including the defendant, Meyers, or their agents, servants and/or employees, to the Plaintiff.

23       4.      The defendant, STEPHANIE SHACKELFORD, ("Shackelford") is, and at all

24   times herein mentioned was, a resident of the County of Sonoma, State of California.

25       5.      Prior to April of 2018, and continuing through October of 2018, the defendant,

26   Shackelford, was a duly authorized agent, servant and/or employee of the defendant MFS

27                                          Page 2

28       Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1   and/or one or more of its business entities set forth above, including, but not limited to the

2   defendants, Meyers Financial Services, Inc. and Meyers, or one of her entities. The defendant,

3   Shackelford, as an agent, servant and/or employee of said defendants was acting within the

4   course and scope of her employment, agency and/or servitude and under the direct supervision,

5   guidance and control of the defendants, MFS and Meyers Financial Services, Inc. and/or Does

6   1-20, and/or with the permission and consent of same, when dealing with the Plaintiff of his

7   accounts.

8       6.      Under the IAA, the defendants, MFS, Meyers Financial Services, Inc., and

9   Meyers, their agents, servants and/or employees accepted their appointment as investment

10  advisor and resulting fiduciary duties of the utmost good faith, acting solely in the best interest

11  of and for the Plaintiff, as Client,  pursuant to the terms and conditions of that agreement and

12  the standards of care and ethics of a certified investment advisory and financial planner,

13  including avoiding any conflicts of interest, duty of full disclosure to the Client, and not

14  borrowing funds from the Client.  As an agent, servant and/or employee of the defendants,

15  MFS, Meyers Financial Services, Inc., and Meyers, the defendant, Shackelford, owed the same

16  fiduciary duties of the utmost good faith, acting solely in the best interests of and for the

17  Plaintiff, as Client, pursuant to the terms and conditions of the IAA, together with the standard

18  care and ethics of a certified investment advisory and financial planning business, including

19  avoiding any conflicts of interest, mandated duty of full disclosure to the Client, and the

20  prohibition of not borrowing funds from the Client.

21      7.      The true capacities, whether individual or corporate, associate or otherwise, of

22  the defendants named herein as Does 1-20, inclusive, and each of them, are unknown to the

23  Plaintiff, who therefore sue such defendants by their fictitious names.  Plaintiff will amend this

24  complaint to allege their true names and capacities when ascertained, as well as their

25  responsibility for the claims alleged herein.

26      8.      The Plaintiff is informed and believes and thereon alleges that at all times herein

27

Page 3

28  Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1  mentioned, each of the said fictitiously named or actually named defendants, was the principal,

2  agent, servant, or employee of the other fictitiously named defendants, and was acting either as

3  a principal or within the course and scope of their agency, servitude or employment and took

4  some part in the acts or omissions hereinafter set forth, by reason of which each of said

5  fictitiously named defendants is liable to the Plaintiff for the relief prayed for herein.

6        9.    All of the acts, transactions and/or incidents giving rise to this action occurred in

7  the County of Sonoma, State of California.

8        10.    On or before April 20, 2018, the defendant, Shackelford, while an employee,

9  agent or servant of the defendants, MFS, Meyers Financial Services, Inc., and Meyers,

10  approached the Plaintiff at the offices of the defendants, MFS, Meyers Financial Services, Inc.,

11  and Meyers, in the City of Sonoma and requested that he as trustee of his trust, loan her the

12  sum of Thirty Thousand Dollars ($30,000.00). The defendant, Shackelford, as an employee,

13  agent and/or servant of said defendants, was aware of the Plaintiff's financial accounts and

14  amounts held therein as a part of the confidential information held by the defendants, MFS,

15  Meyers Financial Services, Inc., and Meyers. The defendant, Shackelford, at the offices of the

16  defendants, MFS, Meyers Financial Services, Inc., and Meyers, in the City of Sonoma

17  convinced the Plaintiff that he could borrow the funds from his trust's investment account and

18  loan it to her at a three percent (3%) interest rate, making repayment on the loan in monthly

19  payments of Ninety Dollars ($90) until the principal and interest were paid in full, commencing

20  on the first day of May, 2018.

21        11.    On or about April 20, 2018, the defendant, Shackelford, at the offices of the

22  defendants, MFS, Meyers Financial Services, Inc., and Meyers in the City of Sonoma, arranged

23  for the Plaintiff as trustee of his trust, to take Thirty Thousand Dollars ($30,000) from his

24  investment account maintained through the offices of the defendants, MFS, Meyers Financial

25  Services, Inc., and Meyers, and loan the same to the defendant, Shackelford. In exchange, the

26  defendant, Shackelford, memorialized the loan arrangement by executing a written Promissory

27
                              Page 4

28      Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1   Note Installment Payments with Interest ("the promissory note"). A copy of the promissory
2   note is attached hereto as Exhibit 2 and made a part hereof. At no time prior to making the
3   loan to the defendant, Shackelford, was the Plaintiff advised by the defendant, Shackelford or
4   the defendants, MFS, Meyers Financial Services, Inc., and Meyers, that under the rules of
5   professional conduct and ethics, none of said defendants, including the defendant, Shackelford,
6   were permitted to borrow money from their client, the Plaintiff and certainly not without full
7   disclosure of conflicts of interest and under the highest standard of fiduciary duties.

8         12.    The Plaintiff is informed and believes that the defendant, Shackelford, as a
9   person acting as a fiduciary to the Plaintiff took the Plaintiff's money wrongfully and with
10  intent to defraud the Plaintiff and with no real intention of repaying it.

11        13.    In or about August of 2018, the defendant, Shackelford, while an employee,
12  agent or servant of the defendants, MFS, Meyers Financial Services, Inc., and Meyers, again
13  approached the Plaintiff at the offices of the defendants, MFS, Meyers Financial Services, Inc.,
14  and Meyers, in the City of Sonoma, and requested that the Plaintiff as trustee of his trust, loan
15  her the sum of Four Hundred Eighty Thousand Dollars ($480,000.00) to pay off an existing
16  hard money loan which she had taken out in March of 2017 secured her personal residence
17  located at 17600 Sunset Way, Sonoma, California ("the residence"). The defendant,
18  Shackelford represented to the Plaintiff that he, as trustee of his investment account held
19  through the defendants, MFS, Meyers Financial Services, Inc, and Meyers, could borrow the
20  money secured by his investment accounts at an interest rate of Three and 99/100 percent
21  (3.99%) and then loan those same funds to her at the same interest rate for a period of three (3)
22  years.

23        14.    The defendant, Shackelford, failed to advise the Plaintiff that such loan through
24  the investment account was a variable rate, while her borrowing of the funds was to be at a
25  fixed rate, exposing him to potential investment losses, and further failed to advise the
26  Plaintiff that the proposed loan was well below a market rate of interest and well below the

27
                                        Page 5
28  Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1    interest rate being paid by the defendant, Shackelford under her existing hard money loan. The
2    defendant, Shackelford, as an employee, agent and/or servant of said defendants, was aware of
3    the Plaintiff's financial accounts and amounts held therein as a part of the confidential
4    information held by the defendants, MFS, Meyers Financial Services, Inc., and Meyers. The
5    defendant, Shackelford, advised the Plaintiff that if he loaned the money to the defendant, she
6    would execute a first position deed of trust against the residence after paying of the existing
7    hard money loan and getting a deed of full reconveyance from the hard money lender.

8          15.    On or about August 24, 2018, the Plaintiff, as trustee of his trust, took Four
9    Hundred Eighty Thousand Dollars ($480,000) from his investment account maintained through
10   the offices of the defendants, MFS, Meyers Financial Services, Inc., and Meyers, and loaned
11   the same to the defendant, Shackelford, and, in exchange, the defendant, Shackelford
12   memorialized the loan arrangement by signing a handwritten note. A copy of that handwritten
13   note is attached hereto as Exhibit 3. Nothing in the note contained any recordable interest in
14   the residence. At not time prior to making the loan to the defendant, Shackelford, was the
15   Plaintiff advised by the defendant, Shackelford, or the defendants, MFS, Meyers Financial
16   Services, Inc., and Meyers, that under the rules of professional conduct and ethics, none of said
17   defendants, including the defendant, Shackelford, were permitted to borrow money from their
18   client, the Plaintiff.

19         16.    At no time prior to the loan funding did the defendants, or any of them, provide
20   the Plaintiff with any written promissory note, execute any recordable deed of trust against the
21   residence to secure the loan, make any other disclosures regarding the loan or loan terms except
22   as set forth in Exhibit 3, or advise the Plaintiff that the loan was below market interest rate, all
23   a conflict of interest and in direct violation of their fiduciary duties to the Plaintiff.

24         17.    On or about December 3, 2018, approximately four (4) months after the Plaintiff
25   had loaned the money to the defendant, Shackelford, the defendant, Shackelford, as Maker,
26   finally after repeated requests from the Plaintiff, executed an Installment Note (Interest Only

27
                                    Page 6
28   Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1  Payments) prepared by First American Title Company at the Sonoma office as an

2  accommodation, made payable to the Plaintiff as Holder ("the Installment Note") with interest

3  from August 24, 2018 at an interest rate of three and 99/100 percent (3.99%) payable monthly

4  in interest only payments on the 24th day of each and every month, commencing September 24,

5  2018 and monthly thereafter until August 24, 2021, at which time the entire unpaid balance of

6  principal and interest would be due and payable.  A copy of the Installment Note is attached

7  hereto as Exhibit 4 and made a part hereof.

8       18.    On or about that same December 3, 2018 date, the defendant, Shackelford, as

9  Trustee, finally after repeated requests from the Plaintiff, executed a Deed of Trust with

10  Assignment of Rents,  prepared by First American Title Company at the Sonoma office as an

11  accommodation, naming the Plaintiff as Beneficiary and First American as the Trustee ("the

12  deed of trust").  The deed of trust was given to secure the Installment Note and constituted a

13  first priority lien against the residence.  First American charged the Plaintiff for title charges,

14  escrow fees and title insurance in the total amount of $1,121.50 which the defendant,

15  Shackelford refused to pay.  The deed of trust was duly recorded in the Official Records of

16  Sonoma County on December 19, 2018 as Instrument No. 2018086232.  A copy of the deed of

17  trust is attached hereto as Exhibit 5 and made a part hereof.

18                              FIRST CAUSE OF ACTION

19                              BREACH OF CONTRACT

20       19.    The Plaintiff realleges and incorporates by this reference each and every

21  allegation of Paragraphs 1-12.

22       20.    The defendant, Shackelford, has breached the promissory note and has failed to

23  pay the monthly payments for the months of July, 2018 through the present.

24       21.    The promissory note provides for the payment of a late fee in the amount of five

25  percent (5%) if any installment due under the promissory note is not received by the Plaintiff

26  within five (5) days of the date due.  If any monthly installment is not received by Lender

27                                    Page 7

28  Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1  within five (5) days of its due date, the Plaintiff may demand that the defendant, Shackelford

2  repay the entire amount of unpaid principal and interest.  The defendant, Shackelford, has,

3  despite demand by Plaintiff, failed to pay either the late fees or the entire outstanding balance

4  of principal and interest due as a result of her breaches of the promissory note.

5       22.    The promissory note also provides that in the event the Plaintiff, as lender, sues

6  the defendant, Shackelford, as Borrower to collect on the promissory note, the Borrower agrees

7  to pay Lender's attorneys' fees in the amount the court finds fair and reasonable.

8       23.    The Plaintiff has performed each and every obligation required to be performed

9  by him under the Promissory note.

10       24.    As a direct and proximate result of the breaches of the promissory note, the

11  Plaintiff has been damaged as follows: monthly payments of Ninety Dollars for the months of

12  July, 2018 and monthly thereafter until judgment is entered; for late fees on the monthly

13  amounts due for the months of July 2018, and monthly thereafter until judgment is entered; and

14  for the entire balance of principal and interest due on the promissory note in an amount to be

15  determined after any credits due prior to judgment.

16       25.    The Plaintiff has also had to incur attorney's fees to prosecute this action to

17  collect on the underlying promissory note.

18       Wherefore, Plaintiff prays judgment as hereinafter set forth.

19  <div align="center">SECOND CAUSE OF ACTION</div>

20  <div align="center">BREACH OF FIDUCIARY DUTIES</div>

21       26.    The Plaintiff realleges and incorporates by this reference each and every

22  allegation of Paragraphs 1-25.

23       27.    In taking the Thirty Thousand Dollar $30,000) loan from the Plaintiff, the

24  defendant, Shackelford and the defendants, MFS, Meyers Financial Services, Inc., and Meyers,

25  as the defendant Shackelford's employer, principal and/or master, breached their fiduciary

26  duties to the Plaintiff as his financial and investment advisor under the IAA and the rules of

27  <div align="center">Page 8</div>

28  Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1  professional care and ethics of a certified investment advisory and financial planner, including

2  those requiring the avoidance of any conflicts of interest, duty of full disclosure to the Client,

3  and not borrowing funds from the Client.

4       28.    As a direct and proximate result of the breaches of fiduciary duties by the

5  defendants, and each of them, the Plaintiff has been damaged as follows: monthly payments of

6  Ninety Dollars for the months of July, 2018 and monthly thereafter until judgment is entered;

7  for late fees on the monthly amounts due for the months of July 2018, and monthly thereafter

8  until judgment is entered; for the entire balance of principal and interest due on the promissory

9  note in an amount to be determined after any credits due prior to judgment; and for attorney's

10  fees and costs incurred herein.

11       29.    The defendants, and each of them, in further breach of their fiduciary duties,

12  acted with the intent to vex, injury or annoy and with conscious disregard of the Plaintiff's

13  rights as their principal, and the Plaintiff is, therefore entitled to punitive damages in an amount

14  to be set by the Court, in an amount not greater than four (4) times the damages incurred by the

15  Plaintiff as proven at trial.

16  <div align="center">THIRD CAUSE OF ACTION</div>

17  <div align="center">FINANCIAL ELDER ABUSE</div>

18       30.    The Plaintiff realleges and incorporates by this reference each and every

19  allegation of Paragraphs 1-25, inclusive.

20       31.    The defendant, Shackelford, took $30,0000 of the Plaintiff's investment funds

21  from the Plaintiff, an elder, for her own benefit, while acting as a fiduciary to the Plaintiff with

22  duties of the utmost good faith and with the duty to act solely in the best interest of and for the

23  Plaintiff.  As a direct and proximate result of this taking of the Plaintiff's investment funds of

24  $30,000 by the defendant, Shackelford, the Plaintiff has suffered financial elder abuse and has

25  been damaged in the amount of $30,000 together with interest thereon at the legal rate from the

26  date of making until paid.

27

28

<div align="center">Page 9</div>

Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1        32.    As a further direct and proximate result of the wilful and intentional financial

2    elder abuse by a fiduciary, the Plaintiff is entitled to exemplary damages and attorneys' fees

3    and costs in amounts to be determined by the Court.

4                        FOURTH CAUSE OF ACTION

5                BREACH OF CONTRACT-JUDICIAL FORECLOSURE

6        33.    The Plaintiff realleges and incorporates by this reference each and every

7    allegation of Paragraphs 1-9 and 13-18, inclusive.

8        34.    The defendant, Shackelford, has breached the Installment Note by failing to pay

9    the monthly installments of interest only for the months of January, February and March of

10   2019. In addition, the Installment Note provides for the recovery of a late fee of five percent

11   (5%) of each month installment if delinquent more than ten (10) days. As a result, the Plaintiff

12   has elected to call the Installment Note now due and payable in accordance with the terms

13   thereof and there is now due, owing and unpaid, the principal sum of $480,000 together with

14   interest thereon at the legal rate from the filing of this complaint until paid in full, together with

15   late fees of $239.40, as of the filing of this Complaint.

16       35.    Plaintiff is now and at all times herein mentioned was, the lawful owner and

17   holder of the Installment Note and Beneficiary under the deed of trust.

18       36.    As a direct and proximate result of the defaults of the defendant, Shackelford,

19   the Plaintiff has elected to institute judicial foreclosure of the Installment Note secured by the

20   deed of trust.

21       WHEREFORE, Plaintiff prays judgment as hereinafter set forth.

22                      FIFTH CAUSE OF ACTION

23       BREACH OF FIDUCIARY DUTIES-RESCISSION AND RESTITUTION

24       37.    The Plaintiff realleges and incorporates each and every allegation of Paragraphs

25   30-31, inclusive.

26       38.    In taking the Four Hundred Eighty Thousand Dollar ($480,000) loan from the

27                         Page 10

28       Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1   Plaintiff, the defendant, Shackelford and the defendants, MFS, Meyers Financial Services, Inc.,

2   and Meyers, as the defendant Shackelford's employer, principal and/or master, breached their

3   fiduciary duties to the Plaintiff as his financial and investment advisor under the IAA and the

4   rules of professional care and ethics of a certified investment advisory and financial planner,

5   including those requiring the avoidance of any conflicts of interest, duty of full disclosure to

6   the Client, and not borrowing funds from the Client.

7       39.    As a direct and proximate result of the breaches of fiduciary duties by the

8   defendants, and each of them, the Plaintiff has been damaged as follows: monthly interest only

9   payments of Fifteen Hundred Ninety Six Dollars ($1,596.00) for the months of January,

10   February and March of 2019 and monthly thereafter until judgment is entered; for late fees on

11   the monthly amounts due for the months of January through March 2019, and monthly

12   thereafter until judgment is entered; for the entire balance of principal and interest due on the

13   Installment Note in an amount to be determined after any credits due prior to judgment; and for

14   attorney's fees and costs incurred herein.

15       40.    As a further direct and proximate damage caused by the breaches of fiduciary

16   duties, the Plaintiff is entitled to rescission of the Installment Note loan. Plaintiff hereby offers

17   to cancel the Installment Note and release the lien of the deed of trust concurrently with the

18   repayment to the Plaintiff of the principal amount of the Installment Note of $480,000, together

19   the financial losses set forth above, including reasonable attorneys' fees and costs.

20       41.    The defendants, and each of them, in further breach of their fiduciary duties,

21   acted with the intent to vex, injury or annoy and with conscious disregard of the Plaintiff's

22   rights as their principal, and the Plaintiff is, therefore entitled to punitive damages in an amount

23   to be set by the Court, in an amount not greater than four (4) times the damages incurred by the

24   Plaintiff as proven at trial.

25                            SIXTH CAUSE OF ACTION

26                            FINANCIAL ELDER ABUSE

27                                   Page 11

28   Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1    42.    The Plaintiff realleges and incorporates by this reference each and every

2    allegation of Paragraphs 1-25, inclusive.

3    43.    The defendant, Shackelford, took $480,000 of the Plaintiff's investment funds

4    from the Plaintiff, an elder, for her own benefit, while acting as a fiduciary to the Plaintiff with

5    duties of the utmost good faith and with the duty to act solely in the best interest of and for the

6    Plaintiff.  As a direct and proximate result of this taking of the Plaintiff's investment funds of

7    $480,000, the Plaintiff has suffered financial elder abuse and has been damaged as set forth

8    herein.

9    44.    As a further direct and proximate result of the wilful and intentional financial

10   elder abuse by a fiduciary, the Plaintiff is entitled to exemplary damages and attorneys' fees

11   and costs in amounts to be determined by the Court.

12   WHEREFORE, Plaintiff prays judgment as follows:

13   FIRST CAUSE OF ACTION: Against Defendant, Shackelford:

14   1.    For monthly payments of Ninety Dollars ($90.00) for the months of July, 2018

15         and monthly thereafter until judgment is entered; for late fees on the monthly

16         amounts due for the months of July 2018, and monthly thereafter until judgment

17         is entered; and for the entire balance of principal and interest due on the

18         promissory note in an amount to be determined after any credits due prior to

19         judgment;

20   2.    For reasonable attorneys' fees;

21   3.    For costs of suit; and

22   4.    For such other and further relief as the Court deems just and proper.

23   SECOND CAUSE OF ACTION: Against all defendants:

24   1.    For monthly payments of Ninety Dollars ($90.00) for the months of July, 2018

25         and monthly thereafter until judgment is entered; for late fees on the monthly

26         amounts due for the months of July 2018, and monthly thereafter until judgment

27



Page 12

28   Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1   is entered; and for the entire balance of principal and interest due on the

2   promissory note in an amount to be determined after any credits due prior to

3   judgment;

4   2.   For punitive damages in an amount set by the Court in an amount not greater

5   than four (4) times the actual damages sustained by the Plaintiff.

6   3.   For reasonable attorneys' fees;

7   4.   For costs of suit; and

8   5.   For such other and further relief as the Court deems just and proper.

9   THIRD CAUSE OF ACTION: against defendant, Shackelford:

10   1.   For the principal sum of Thirty Thousand Dollars ($30,000.00), together with

11   interest thereon at the legal rate from making until paid,

12   2.   For punitive damages in an amount set by the Court in an amount not greater

13   than four (4) times the actual damages sustained by the Plaintiff;

14   3.   For reasonable attorneys' fees;

15   4.   For costs of suit; and

16   5.   For such other and further relief as the Court deems just and proper.

17   FOURTH CAUSE OF ACTION: Against the defendant, Shackelford:

18   1.   For the sum of Four Hundred Eighty Thousand Dollars ($480,000.00) together

19   with interest at the legal rate from the date of making until paid, less any credits

20   for payments received from the date received;

21   2.   For any additional fees and costs incurred under the Installment Note or deed of

22   trust, after the filing of this complaint, including, but not limited to, real

23   property taxes, insurance, etc., if not timely paid by the defendant, Shackelford;

24   3.   Adjudging that the deed of trust attached as Exhibit 5 be foreclosed upon, that

25   the usual judgment be made for the sale of the underlying real property

26   residence according to law by the levying officer to be appointed by the Court,

27

Page 13

28   Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1   that the proceeds of the sale be applied in payment of the amounts due the

2   Plaintiff, that any Doe Defendant claiming any right, title or interest in the real

3   property residence, after the recordation of the Plaintiff's deed of trust, be barred

4   and foreclosed from all rights, claims, interest, or equity of redemption in the

5   real property residence and every part of that real property residence when the

6   time for redemption has expired.

7   4.   Plaintiff waives judgment for any deficiency between the sale price of the real

8   property residence and the amounts due the Plaintiff;

9   5.   Permitting the Plaintiff to become a purchaser at the foreclosure sale;

10   6.   Directing the levying officer, after the time for redemption has elapsed, to

11   execute a deed to the purchaser of the real property residence at the sale, and

12   directing that the purchaser be then let into possession of the real property

13   residence on production of the levying officer's deed;

14   7.   For reasonable attorneys' fees;

15   8.   For costs of suit; and

16   9.   For such other and further relief as the Court deems just and proper.

17   FIFTH CAUSE OF ACTION: Against all defendants:

18   1.   That this Court declare that the Installment Note has been rescinded;

19   2.   That the defendants be ordered to pay Plaintiff, the sum of Four Hundred Eighty

20   Thousand Dollars (480,000.00), together with interest thereon at the legal rate

21   from August 24, 2018 until paid in full;

22   3.   For sums paid by Plaintiff for title insurance, escrow and title fees in the amount

23   of One Thousand One Hundred Twenty-One Dollars and Fifty Cents

24   ($1,121.50), together with interest thereon at the legal rate from December 3,

25   2018 until paid;

26   4.   For exemplary damages in an amount not greater than four times the damages

27

Page 14

28   Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

1      sustained by Plaintiff herein;

2      5.   That Plaintiff be ordered to release the lien of his deed of trust on the condition

3           that the judgement damages awarded herein, other than exemplary damages, are

4           paid to Plaintiff;

5      6.   For reasonable attorneys' fees;

6      7.   For costs of suit; and

7      8.   For such other and further relief as the Court deems just and proper.

8

9   Dated: March 14, 2019                    LAW OFFICES OF MIKEL D. BRYAN, P.C.

10                              By:

11                                    MIKEL D. BRYAN
                                      Attorney for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                              Page 15

28   Complaint for Breach of Fiduciary Duties, Breach of Contract, Financial Elder Abuse, etc.

Exhibit 1

# Meyers Financial Services Inc.

## INVESTMENT ADVISORY AGREEMENT

_called_
_TD_ _12/26/17 AIMP_
_8; 50 Am_

On this __19__ day of __December__, in the year __2017__, by and between Meyers Financial Services Inc. ("MFSI") and __William WROBEL__ ("Client").

### WITNESSETH

WHEREAS, the undersigned Client being duly authorized has funds available ("Account"). In consideration of the premises and mutual covenants contained herein, and intending to be legally bound hereby agrees to the following terms and conditions:

INVESTMENT ADVISORY SERVICES – Investment Advisory Services are detailed throughout this Agreement. The fee arrangements for these services are detailed in Schedule D of this agreement.

FINANCIAL PLANNING SERVICES – Financial Planning Services are offered on a negotiable fixed or hourly fee basis. Financial Planning Services are exclusive of supervising investments. Services are completed and delivered inside of thirty (30) days as detailed and initialed in Schedule D.

### (A) Appointment and Acceptance as Investment Advisor

The client hereby appoints MFSI as investment advisor for the Account. MFSI shall supervise and direct the investments of and for the Account, subject to the objectives, limitations and restrictions listed in the Client's Investment Policy Statement (Schedule A). Any other persons authorized to act on behalf of the Client with respect to the Account are identified in Schedule B.

### (B) Duties of MFSI

MFSI hereby accepts appointment and fiduciary duty of utmost good faith to act solely in the best interest of each client pursuant to the terms and conditions set forth in this Agreement and to comply with impartial conduct standard of:

- Charging no more than reasonable compensation for services provided; and
- Making no misleading statements regarding investments, compensation and conflicts of interest.

### MFSI shall have full power and authority in its sole discretion to:

1. Direct the Custodian to invest and reinvest or sell and otherwise dispose of the Account assets in common and preferred stocks, bonds, debentures, notes, mutual fund shares, exchange traded funds, options, variable life insurance, and variable annuities.

2. Direct the Custodian to exercise or abstain from exercising any options, privileges or rights held as part of the account.

3. Render to Client at least quarterly a written statement of the investments of the Account. This statement may come directly from the Custodian.

MFSI will not be required to take any action or render any advice with respect to the voting of proxies solicited by or with respect to the issuers of securities in which assets of the Account may be invested from time to time.

MFSI represents and warrants that it has full power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms and that it is duly registered as an

investment advisor under the laws of the State of California and other jurisdictions in which it may conduct business.

### *(C) Duties of Client*

Client agrees to:

1. Notify MFSI of a change in life status including but not limited to, employment, retirement, marital status, or household.

2. Promptly notify MFSI in writing of any changes to its investment policy, and any changes to the restrictions or limitations applicable to the Account, and to provide MFSI with prior written notice of any changes in the identity of persons authorized to act on behalf of the Client with respect to the Account.

3. Execute any and all agreements, including limited powers of attorney, necessary or appropriate to enable MFSI to perform its investment advisory services hereunder.

4. Cause the Custodian to pay all Account charges and fees, including but not limited to brokerage commissions and taxes, and investment advisory fees.

### *(D) Custodian*

The Custodian at the time this Agreement is executed is identified in Schedule C. MFSI may receive certain administrative benefits from the Custodian that enable MFSI to provide the Client with advisory services. Under no circumstances will MFSI act as. Custodian for the Account or have possession·of any portion of the cash or investments of the account except for authorized fee withdrawal.

**MFSI is deemed to have constructive custody solely because advisory fees are directly deducted from client's accounts by the custodian on behalf of MFSI.**

### *(E) Directed Brokerage*

MFSI does not allow clients to direct brokerage.

### *(F) Services to Other Clients*

It is understood that MFSI performs investment advisory services for various clients. Client agrees that MFSI may give advice and take action in the performance of its duties with respect to any of its other clients which may differ with the advice given or action taken with respect to the Account, so long as it is MFSI 's policy, to the extent practical, to allocate investment opportunities to the Account over a period of time on a fair and equitable basis relative to other clients. Nothing in this Agreement shall be deemed to confer upon MFSI any obligation to acquire for the Account a position in any security which MFSI , its principals or employees may acquire for its or their own accounts or for the account of any other client, if in the sole and absolute discretion of MFSI it is not for any reason practical or desirable to acquire a position in such security for the Account. MFSI shall not be held responsible for any loss incurred by reason of any act or omission of any broker or the Custodian for the Account.

### *(G) Fees*

Investment management fees are billed monthly in advance, meaning we bill you at the beginning of the month. Fees are usually deducted from a designated client account to facilitate billing. The client must consent in advance to direct debiting of their investment account.

The annual Fee may be negotiable. Accounts within the same household may be combined for a reduced fee. Fees are billed monthly in advance based on the amount of assets managed as of the close of business on the last business day of the prior month. Monthly advisory fees deducted from the clients' account by the custodian will be reflected in a provided fee invoice as fees are withdrawn. The client must consent in advance to direct debiting of their investment account.

Client acknowledges that representatives of MFSI may provide client with various insurance products upon which a commission may be paid to MFSI representatives, and such commissions are separate and apart from the fees charged under this Agreement. A conflict exists because of the relationship. This conflict is mitigated by disclosures, procedures, and the firm's Fiduciary obligation. MFSI is in compliance with CCR Section 260.235.2. The client is under no obligation to act upon the investment advisor's recommendations. If the client elects to act on any of the recommendations, the client is under no obligation to effect the transaction through MFSI.

In computing the market value of any investment of the Account, each security listed on any national securities exchange or otherwise subject to current last-sale reporting shall be valued at the last sale price on the valuation date. However, for assets such as alternative investments where a fee is charged and the custodian does not price the security, the asset may be priced by the provider of the asset according to their pricing policy or may also involve independent pricing services for assets that are priced in that manner. MFSI itself, does not price any investment or security for which it charges a management fee or that is included in the portfolio return. The fee is based on the determined value of the securities in the portfolio as of the final date of the preceding month.

The investment advisory fee is billed directly to the Custodian, with an informational copy of the invoice to Client. The Custodian deducts the fee for the Account upon receipt of the invoice, or shortly thereafter. MFSI will not be compensated based on the basis of a share of capital gains or capital appreciation of the assets in the Account.

Client shall be given thirty (30) days prior written notice of any increase in fees and client will acknowledge, in writing, any agreement of increase in said fees.

### *(H) Duration and Termination*
This Agreement shall become effective on the date written above and shall continue in effect until terminated by either party by giving to the other party thirty (30) days written notice.

No assignment of this Agreement by MFSI shall be effective without the prior written consent of Client. Client may terminate the Agreement within five (5) business days of signing, without penalty, and with full refund.

### *(I) Confidentiality*
MFSI agrees that all information concerning the financial affairs of Client shall be treated as confidential and shall not be disclosed to third parties without prior authorization of Client, except as required by law.

### *(J) Title to Assets*
Except to the extent Client has notified, or in the future notifies, MFSI in writing, Client represents that assets in the Account belong to Client free and clear of any liens or encumbrances.

### *(K) Market Conditions*

Client acknowledges that MFSI 's past performance and advice regarding Client's Account cannot guarantee future results. **Client investments can appreciate or depreciate.** MFSI does not guarantee or warranty that services offered will result in profit.

### (L) Notices

All notices and other communications contemplated by this Agreement shall be deemed duly given if it is transmitted to MFSI at:

> 670 West Napa Street, Suite C
> Sonoma, CA 95476

And to Client at the address appearing below, or at such other address or addresses that shall be specified, in each case, in a written notice similarly given.

### (M) Limitation of Liability

MFSI shall not be responsible for acts, omissions, or solvency of the Custodian or any broker or agent selected by it to affect any transactions for the Account. MFSI shall not be relieved of any liability imposed by any applicable state laws that cannot be waived.

### (N) Governing Law

The validity of this Agreement and the rights and liabilities of the parties hereunder shall be determined in accordance with the laws of the State in which the client resides, except to the extent preempted by ERISA.

### (O) Arbitration

Any controversy or claim, including, but not limited to, errors and omissions arising out of, or relating to, this Agreement or the breach thereof, may be settled by arbitration, if the parties agree to arbitrate the controversy or claim and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Client understands that this Agreement to consider arbitration does not constitute a waiver of the right to seek a judicial forum where such waiver would be void under federal or state securities laws.

### (P) Captions

The section headings of this Agreement are inserted for convenience of reference only, and shall not affect the interpretation of this Agreement.

### (Q) Brochure and Privacy Notice

Client acknowledges receipt of the Privacy Policy and Form ADV Part 2A & 2B of MFSI. If Form ADV Part 2A & 2B was not delivered to the client at least 48 hours prior to the client entering into any written advisory contract with this investment adviser, then the client has the right to terminate the contract without penalty within five (5) business days after entering into the contract. For the purposes of this provision, a contract is considered entered into when all parties to the contract have signed the contract, otherwise signified their acceptance, any other provisions of this contract notwithstanding.

_WD W_     _12/19/17_     _WDW_     _12/19/17_
Client Initials     Date          Client Initials     Date

Client chooses to have the following delivered via electronic communication via the following

Email address: _____

☒ Annual Delivery of Privacy Policy
☑ Annual Delivery of Form ADV Part 2
☑ Other _*NONE*_  $300.00

*No Financial Planning*
*or Tax Discounts*
*Invest Management Only*

**Email Address Certification.** You certify that the email address you provided above is a functioning email address; owned and maintained by you or your agent on your behalf, and that all electronic communications of reports sent to the Email Address shall be accessible by you. You agree to notify us in writing, of any change in the Email Address.

### (R) Entire Agreement and Amendment

This Agreement (including the Schedules listed below) contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior written agreements and understandings with respect hereto. This Agreement may only be amended or modified, and the terms hereof may only be waived, by a writing signed by all parties hereto or in the case of a waiver, by the party entitled to the benefit of the terms being waived.

<div align="center">

Schedule A    Client's Written Investment Policy
Schedule B    Identification of Authorized Persons
Schedule C    Identification of Custodian
Schedule D    Schedule of Fees

</div>

## SCHEDULE A

### Client's Written Investment Policy

Complete the information below for each different registration type.

**Account 1**
Owner of account: _Bill WRObel_
Type of account: _IRA_
Risk tolerance: _Moderate_
Investment objective: _Income_
Investment horizon: _10yrs_
Restrictions: _None_
Client initials: _WD_

**Account 2**
Owner of account: _Bill WRObel_
Type of account: _Trust_
Risk tolerance: _moderate_
Investment objective: _Income_
Investment horizon: _10yrs._
Restrictions: _None._
Client initials: _WD_

**Account 3**
Owner of account: _____
Type of account: _____
Risk tolerance: _____
Investment objective: _____
Investment horizon: _____
Restrictions: _____
Client initials: _____

**Account 4**
Owner of account: _____
Type of account: _____
Risk tolerance: _____
Investment objective: _____
Investment horizon: _____
Restrictions: _____
Client initials: _____

**Account 5**
Owner of account: _____
Type of account: _____
Risk tolerance: _____
Investment objective: _____
Investment horizon: _____
Restrictions: _____
Client initials: _____

**Account 6**
Owner of account: _____
Type of account: _____
Risk tolerance: _____
Investment objective: _____
Investment horizon: _____
Restrictions: _____
Client initials: _____

Attach additional sheets as necessary.

## SCHEDULE B

### Identification of Additional Authorized Persons

The following persons are authorized to receive information with respect to the Account. Client will provide MFSI with prior written notice of any changes to authorized persons.

Name(s): _____

## SCHEDULE C

### Identification of Custodian

Brokerage Firm: _____ _TD AMERITRAD_

SCHEDULE D

**Schedule of Fees**

*Managed by MFSI :*

MFSI offers discretionary asset management services to advisory clients. The fees for these services will be based on a percentage of Assets Under Management and will not exceed 1.5%.

The annual Fee may be negotiable. Accounts within the same household may be combined for a reduced fee. Fees are billed monthly in advance based on the amount of assets managed as of the close of business on the last business day of the prior month. Monthly advisory fees deducted from the clients' account by the custodian will be reflected in a provided fee invoice as fees are withdrawn. The client must consent in advance to direct debiting of their investment account.

The annual fee for this account is _____/____%.

By initialing below, Client agrees to the above fee schedule.

| _WD W_ | _12/19/17_ | _____ | _____ |
|---|---|---|---|
| Client Initials | Date | Client Initials | Date |

*Fees for Financial Planning Services:*

Financial Planning and Consulting Services are offered based on an hourly rate of $300 and fixed fee ranging between $2,000 and $10,000 based on complexity and unique client needs. The fees are negotiable. MFSI reserves the right to waive financial planning fees if plan is implemented with MFSI. The payment is due in full upon commencement of the agreement. Financial plans will be completed and delivered inside of thirty (30) days.

Client may cancel within five (5) business days, for a full refund. If a client cancels after five (5) business days, MFSI is entitled to a pro-rata fee based on the percentage of work completed. All unearned fees will be refunded to the client.

☑ **FIXED FEE**
*The Fixed Fee for preparing the financial plan is $ 300. 00 huly*

| _WD W_ | _12/19/17_ | _____ | _____ |
|---|---|---|---|
| Client Initials | Date | Client Initials | Date |

☐ **HOURLY FEE**
*The estimated number of hours _____ @ $300/Hour. The total fee Fee for preparing the financial plan is $_____.*

| _____ | _____ | _____ | _____ |
|---|---|---|---|
| Client Initials | Date | Client Initials | Date |

November 2016

7

Scope of Services

*Only Investment Management*

IN WITNESS WHEREOF, the parties hereto have executed and agreed to this Agreement as of the date below,

Meyers Financial Services Inc.

*12/19/17*

By: _William W Robe_     Date: _12/19/17_

CLIENT DATA

Name: _William Wrobel_

Address: _630 Watmaugh Rd_

_Sonoma    CA       95476_

_William Wrobel_                    Date: _12/19/17_
Client Signature

_____       Date: _____
Client Signature

November 2016                                                    8

Exhibit 2

# Promissory Note
## Installment Payments with Interest

**1. Borrower(s)**

Name of Borrower 1: _Stefanie Shackelford_

Name of Borrower 2: _____

**2. Lender**

Name of Lender: _William D. Wsobel_

**3. Loan**

In return for a loan Borrower has received from Lender, Borrower promises to pay to Lender the amount of $ _30,000.00_ (principal), plus interest on unpaid principal at the rate of _3_ % per year from the date this note is signed until it is paid in full. If there is more than one borrower, they agree to be jointly and severally liable.

**4. Monthly Payments**

Borrower will pay back the loan in monthly installments, which include ~~principal and~~ interest, of not less than $ _90.00_ per month until the principal and interest are paid in full. Payments will be due on the first day of each month, beginning on _01 May 18_ . Borrower will send all payments to _a meeting mutually agreed upon._ .

**5. Prepayments**

Borrower may make extra payments of principal, in addition to the monthly installment payments, at any time. Borrower will identify any such payments, in writing, as prepayments of principal. Lender will use any prepayments to reduce the amount of principal owed by Borrower. Prepayments will not change the amount or due date of any future installment payments. N/A .  _WDW_

**6. Late Payments**

If any installment payment due under this note is not received by Lender within _5_ days of its due date, Borrower will pay a late fee of five percent of the amount of the monthly payment. The late fee will be due immediately. If any installment payment is not received by Lender within _5_ days of its due date, Lender may demand, in writing, that Borrower repay the entire amount of unpaid principal immediately. After receiving Lender's demand, Borrower will immediately pay the entire unpaid principal. _WDW_

**7. Attorneys' Fees**

If Lender sues Borrower to collect on this note, and wins, Borrower agrees to pay Lender's attorneys' fees in an amount the court finds to be fair and reasonable. _WDW_

**8. Entire Agreement**

This note represents the entire agreement between Borrower and Lender. Any modifications must be in writing and signed by both Borrower and Lender.

A Notary Public or ~ ..ier officer completing this certificate v~ ..ies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

## *California All-Purpose Acknowledgement*

State of California
County of Sonoma
} SS.

On *April 20th 2018* before me   Wendy Lee O'Sullivan , Notary Public

personally appeared   *Stefanie   Shackelford*
                        Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

WENDY LEE O'SULLIVAN
COMM. #2132630
Notary Public - California
Sonoma County
My Comm. Expires Nov. 5, 2018

_____*Optional*_____

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

Description of the Attached Document:

Title of Type of Document: *Promissory Note*

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

Exhibit 3

Bill Wobel agrees to:
loan Stefanie Shackelford
480,000.00 USD to pay off existing
loan on house located on 17600
Sunset Way Sonoma @ 3.99%
interest for three years at
which time, Stefanie must
either refinance or pay off
loan w/ personal funds.

Stefanie Shackelford agrees to
borrow 480,000.00 USD from Bill
Wobel in order to pay off existing
hard money loan on 17600 Sunset
Way Sonoma @ 3.99% for three
years at which time Stefanie
must pay off the loan w/ personal
funds or re-finance the balance
of the loan. Also will repay the
32,000 on or before the expiration
of the 2nd loan.

SShackelford

Exhibit 4

## *DO NOT DESTROY THIS NOTE:*

When paid, this Note and the Deed of Trust securing same, must be surrendered to Trustee
for cancellation and retention before reconveyance of the Deed of Trust will be made.

## INSTALLMENT NOTE
## (INTEREST ONLY PAYMENTS)

**$480,000.00**

**November 30, 2018**
File No. **4906-5776957**

For value received, all of the undersigned (collectively referred to as "Maker"), jointly and severally promise to
pay to William D. Wrobel, Trustee of the William D. Wrobel Trust or order ("Holder"), at 630 E. Watmaugh Rd.,
Sonoma, CA 95476 or as directed otherwise in writing by Holder, the principal sum of four hundred eighty
thousand Dollars (**$480,000.00**), with interest from the 24th day of August, **2018** on the amounts of principal
remaining from time to time unpaid, until said principal sum is paid in full, at the rate of Three and 99/100ths per
cent (3.99000 %) per annum, payable in monthly installments equal to interest only or more on the 24th day of
each and every Month, beginning on the 24th day of September, **2018**, and continuing until the 24th day of
August , **2021**, at which time the entire unpaid principal and any accrued interest is all due and payable in full.

IN THE EVENT no principal reduction is made, the monthly Interest Only Payments shall be One Thousand Five
Hundred Ninety Six Dollars ($1,596.00) er month.

BORROWER HAS AGREED TO PAY, AT LENDER'S OPTION, A PAYMENT PROCESSING FEE OF $200.00 FOR ANY
PAYMENT OF PRINCIPAL THAT IS MADE PRIOR TO THE MATURITY DATE.

If this note is secured by real property consisting of one to four residential dwelling units, and is for a term of
more than one year and includes a balloon payment provision, the following statement applies:

This note is subject to Section 2966 of the Civil Code, which provides that the holder of this note shall give
written notice to the trustor, or his successor in interest, of prescribed information at least 90 and not more than
150 days before any balloon payment is due.

All payments under this Note shall be made in lawful money of the United States of America. Payments shall be
credited first against any costs or expenses due under this Note, then to accrued interest, and finally to principal.
The principal amount of this Note may be prepaid, in whole or in part, at any time without penalty (unless a
separate prepayment penalty provision is specifically included in the Note, which terms shall override this
statement), in which event, interest shall cease to accrue on the portion of the principal so prepaid. Should any
amount under this Note not be paid when due, then all remaining principal and accrued interest shall become
immediately due and payable at the option of Holder. In no event shall the interest rate charged under this Note
exceed the maximum rate permitted under applicable law.

If payment of any portion of the installment is delinquent more than 10 days, the Holder may, at his sole option,
assess a late charge of 5% of the amount of the installment for each installment so delinquent.

# INSTALLMENT NOTE
## (INTEREST ONLY PAYMENTS)

**$480,000.00**

**November 30, 2018**
File No. **4906-5776957**

Should suit on this Note or foreclosure of the Deed of Trust (defined below) be commenced, Maker agrees to pay the costs of foreclosure and such additional sums as a court may adjudge reasonable as attorney's fees in any suit.

This Note shall be construed in accordance with the laws of the State of California. Any alteration, change or modification of or to this Note, in order to become effective, shall be made by written instrument executed by both Maker and Holder.

This Note is secured by a deed of trust of even date herewith to **First American Title Insurance Company, a Nebraska Corporation**, as trustee ("Deed of Trust").

**THIS IS A LEGAL DOCUMENT. PLEASE READ IT CAREFULLY.**
**IT IS RECOMMENDED THAT YOU CONSULT YOUR LEGAL COUNSEL**
**BEFORE EXECUTING OR ACCEPTING THIS DOCUMENT.**

**"Maker"**

Stefanie Shackelford

Exhibit 5

Page 1 of 7

**RECORDING REQUESTED BY:**
First American Title Company

**AND WHEN RECORDED MAIL DOCUMENT TO:**
William D. Wrobel Trustee of the William D. Wrobel
Trust
630 E. Watmaugh Rd.
Sonoma, CA 95476

**2018086232**

Official Records Of Sonoma County
William F. Rousseau
12/19/2018 01:37 PM
FIRST AMERICAN TITLE CO.
TRD 7 Pgs
Fee: $186.00

PAID

Space Above This Line for Recorder's Use Only

A.P.N.: 056-313-022-000

File No.: 4906-5776957 (DJ)

## DEED OF TRUST WITH ASSIGNMENT OF RENTS
### (LONG FORM)

THIS DEED OF TRUST, made this **November 30, 2018,** between

TRUSTOR: **Stefanie Shackelford, an unmarried woman**

whose address is **17600 Sunset Way, Sonoma, CA 95476,**

TRUSTEE: **First American Title Insurance Company, a Nebraska Corporation**

and BENEFICIARY: **William D. Wrobel, Trustee of the William D. Wrobel Trust**

WITNESSETH: That Trustor irrevocably grants to Trustee in trust, with power of sale, that property in the City of
Sonoma, County of Sonoma, State of California, described as:

BEING ALL OF LOTS 1 AND 2 AND THE EASTERLY PORTION OF LOT 26, IN BLOCK "E" AS
NUMBERED AND DESIGNATED UPON THE MAP OF SUBDIVISION NO. 1, SONOMA
HIGHLANDS, BEING A PART OF RANCHO AGUA CALIENTE, TOWNSHIP 5 NORTH, RANGE 6
WEST, M.D.M., RECORDED APRIL 8, 1914 IN BOOK 30 OF MAPS, PAGE 27, SONOMA COUNTY
RECORDS, SAID PARCEL OF LAND BEING MORE PARTICULARLY DESCRIBED:

COMMENCING AT THE COMMON NORTHERLY CORNER OF LOTS 25 AND 26, IN SAID BLOCK
"E"; THENCE NORTH 87 DEGREES 30' EAST, AND ALONG THE NORTHERLY LINE OF SAID LOT
26, SAID LINE ALSO BEING THE SOUTHERLY LINE OF BERNHARD AVENUE, A DISTANCE OF
20 FEET, MORE OR LESS, TO THE NORTHEASTERLY CORNER OF THE PARCEL OF LAND
DESCRIBED IN BOOK 1355 OF OFFICIAL RECORDS, PAGE 617, SONOMA COUNTY RECORDS,
SAID POINT BEING THE POINT OF BEGINNING OF THE PARCEL OF LAND TO BE HEREIN
DESCRIBED; THENCE FROM SAID POINT OF BEGINNING, SOUTHEASTERLY AND ALONG THE
EASTERLY LINE OF SAID PARCEL OF LAND DESCRIBED IN BOOK 1355 OF OFFICIAL
RECORDS, PAGE 617, A DISTANCE OF 105 FEET, MORE OR LESS, TO A POINT ON THE
SOUTHERLY LINE OF SAID LOT 26, SAID POINT BEING AT OR NEAR THE COMMON
NORTHERLY CORNER OF LOTS 3 AND 23, IN SAID BLOCK "E"; THENCE NORTH 88 DEGREES
52' EAST, AND ALONG THE SOUTHERLY LINE OF SAID LOTS 1, 2 AND 26, A DISTANCE OF 111
FEET, MORE OR LESS, TO THE WESTERLY LINE OF SUNSET WAY; THENCE NORTH 3 DEGREES
08' WEST AND ALONG THE WESTERLY LINE OF SUNSET WAY A DISTANCE OF 100 FEET,
MORE OR LESS TO THE NORTHEASTERLY CORNER OF SAID LOT 1; THENCE WESTERLY AND

(Continued on Page 2)

1193 (1/94)
Page 1 of 7

**ALONG THE NORTHERLY LINE OF SAID LOTS 1 AND 2 AND 26, A DISTANCE OF 140 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.**

together with rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits for the purpose of securing (1) payment of the sum of $480,000.00, with interest thereon according to the terms of a promissory note or notes of even date herewith made by Trustor, payable to order of Beneficiary, and extensions or renewals thereof, (2) the performance of each agreement of Trustor incorporated by reference or contained herein and (3) payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

A.  To protect the security of this Deed of Trust, Trustor agrees:

   1) To keep said property in good condition and repair, not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefore, to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon, not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

   2) To provide, maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary.  The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor.  Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

   3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

   4) To pay, at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all cost, fees and expenses of this Trust.

   Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

   5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

(Continued on Page 3)

**B.  It is mutually agreed:**

1) That any award in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

2) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require payment when due of all other sums so secured or to declare default for failure so to pay.

3) That at any time or from time to time, without liability therefore and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easements thereon, or join in any extension agreement or any agreement subordinating the lien or charge hereof.

4) That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder.  The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.  The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

5) That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable.  Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine.  The entering upon and taking possession of said property, the collecting of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

6) That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice shall cause to be filed for record.  Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for lawful money of the United States, payable at time of sale.  Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement.  Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied.  The recitals in such deed of any matters or facts

(Continued on Page 4)

shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of trustee and of this Trust, including costs of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

7) That Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby, whether or not named as Beneficiary herein. In this Deed, whenever the context so requires the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

9) That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

10) Trustor requests that copies of the notice of default and notice of sale be sent to Trustor's address as shown above.

Beneficiary requests that copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust be sent to Beneficiary's address, as set forth on page one of this Deed of Trust, as provided by Section 2924(b) of the California Civil Code.

If the Trustor shall sell, convey or alienate said property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the Beneficiary being first had and obtained, Beneficiary shall have the right, at its option, except as prohibited by law, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any Note evidencing the same, immediately due and payable.

Stefanie Shackelford

(Continued on Page 5)

1193 (1/94)
Page 4 of 7

DOC #2018086232 Page 5 of 7

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _California_ )SS

COUNTY OF _Sonoma_ )

On _12/3/18_ before me, _D. James_ , Notary Public, personally appeared _Stefanie Shackelford_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.                                        *This area for official notarial seal.*

_____

Notary Signature

> D. JAMES
> Commission # 2118734
> Notary Public - California
> Sonoma County
> My Comm. Expires Aug 4, 2019

(Continued on Page 6)

DOC #2018086232 Page 6 of 7

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )SS

COUNTY OF _____ )

On _____ before me, _____ , Notary Public, personally appeared

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.                    *This area for official notarial seal.*

_____

Notary Signature

(Continued on Page 7)

1193 (1/94)
Page 6 of 7

DOC #2018086232  Page 7 of 7

----------DO NOT RECORD------------------------------------

**REQUEST FOR FULL RECONVEYANCE**
*To be used only when note has been paid.*

To: First American Title Insurance Company, a Nebraska Corporation , Trustee

Dated:_____

The undersigned is the legal owner and holder of all indebtedness secured by the within Deed of Trust. All sums secured by said Deed of Trust have been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel all evidences of indebtedness, secured by said Deed of Trust, delivered to you herewith together with said Deed of Trust, to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, the estate now held by you under the same.

Mail Reconveyance to:

_____

_____

_____      By_____

_____      By_____

**NOTE:  Signatures on this Request for Full Reconveyance must be notarized.**

Do not lose or destroy this Deed of Trust OR THE NOTE which it secures.
Both must be delivered to the Trustee for cancellation before reconveyance will be made.

1193 (1/94)
Page 7 of 7

1   **STATE OF CALIFORNIA**      )           **PROOF OF SERVICE**
    **COUNTY OF LOS ANGELES**    )    ss.

2

3      I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is: 300 South Grand Avenue, Suite 2600, Los Angeles, CA 90071. On June

4 19, 2019, I served the foregoing document described as:

5      **NOTICE OF REMOVAL AND REMOVAL TO FEDERAL COURT BY DEFENDANT**
                      **MARKEL AMERICAN INSURANCE COMPANY**

6

7 on the parties or attorneys for parties in this action who are identified on the attached service list, using the following means of service. (If more than one means of service is checked, the means of service used for each party is indicated on the attached service list).

8 ☐  **BY PERSONAL SERVICE.** I placed ___ the original or ___ a true copy of the foregoing document in sealed envelopes individually addressed to each of the parties on the attached service list, and caused such

9      envelope to be delivered by hand to the offices of each addressee.

10 ☐  **BY FACSIMILE TRANSMISSION.** I caused ___ the original or ___ a true copy of the foregoing document to be transmitted to each of the parties on the attached service list at the facsimile machine telephone number as last given by that person on any document which he or she has filed in this action

11      and served upon this office.

12 ☑  **BY MAIL.** I placed ___ the original or __✓__ a true copy of the foregoing document in a sealed enveloped individually addressed to each of the parties on the attached service list, and caused each such

13      envelope to be deposited in the mail at 300 South Grand Avenue, Suite 2600, Los Angeles, CA 90071. Each envelope was mailed with postage thereon fully prepaid. I am readily familiar with this firm's practice of collection and processing of correspondence for mailing. Under that practice, mail is

14      deposited with the United States Postal Service the same day that it is collected in the ordinary course of business.

15 ☐  **BY E-MAIL.** I caused the foregoing document(s) to be transmitted by e-mail electronic transmission to the e-mail address on the attached service list as last given by that person on any document which he or

16      she has filed in this action and served upon this office.

17 ☐  **BY EXPRESS MAIL.** I placed ___ the original or ___ a true copy of the foregoing document in a sealed enveloped individually addressed to each of the parties on the attached service list, and caused each such envelope to be deposited in the mail at 300 South Grand Avenue, Suite 2600, Los Angeles, CA 90071.

18      Each envelope was mailed with Express Mail postage thereon fully prepaid. I am readily familiar with this firm's practice of collection and processing of correspondence for mailing. Under that practice, mail

19      is deposited with the United States Postal Service the same day that it is collected in the ordinary course of business.

20 ☐  **BY FEDERAL EXPRESS.** I placed ___ the original or ___ a true copy of the foregoing document in a sealed enveloped or package designated by Federal Express with delivery fees paid or provided for,

21      individually addressed to each of the parties on the attached service list, and caused such envelope or package to be delivered at 300 South Grand Avenue, Suite 2600, Los Angeles, CA 90071, to an

22      authorized courier or driver authorized by Federal Express to receive documents.

23 ☑  **(State)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

24 ☐  **(Federal)** I declare that I am employed in the office of a member of the bar of this court, at whose direction the service was made.

Executed on June 19, 2019, at Los Angeles, California.

25

26

27                                          Ana Chairez

28

---

1

PROOF OF SERVICE

1

### Service List

2

*Meyers Financial Services, Inc., et al. v. Markel American Insurance Company and Does 1-10*
**Case No. SCV 264560**

3

4

| Lewis R. Warren, Esq.<br>Michael R. Wanser, Esq.<br>**ABBEY WEITZENBERG, WARREN &**<br>**EMERY, P.C.**<br>100 Stony Point Road, Suite 200<br>Santa Rosa, CA 95401 | Attorney for Plaintiffs<br>**MEYERS FINANCIAL SERVICES, INC.**<br>and **LILLIAN MEYERS**<br><br>Tel: (707) 542-5050<br>Fax: (707) 542-2589<br>Email: lwareen@abbeylaw.com<br>Email: mwanser@abbeylaw.com |
| --- | --- |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2